In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3665

Randy Boss and Revell Boss,

Petitioners-Appellants,

v.

Guy Pierce and Mark A. Pierson,/*

Respondents-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2874--James B. Moran, Judge.

Argued April 18, 2000--Decided August 31, 2001


 Before Flaum, Chief Judge, and Ripple, and
Williams, Circuit Judges.

 Williams, Circuit Judge.  Randy and
Revell Boss/1 seek writs of habeas
corpus overturning their state robbery
and murder convictions. They argue that
during their trial prosecutors
unconstitutionally withheld from them
material evidence favorable to their
defense, in violation of Brady v.
Maryland, 373 U.S. 83 (1963). The
district court concluded that this
argument did not warrant habeas corpus
relief. Because we believe the Bosses
have adequately established the elements
of a Brady violation, we reverse.

I.   BACKGROUND

A.   The Facts

 At the Bosses' joint trial, the state
sought to prove that the Bosses, along
with two co-defendants who were tried
separately, Nikia Harris and Corey
Carter, robbed and beat to death Eugene
Oliver, a 52-year-old neighborhood
resident. Robert McAfee, a teenager at
the time of the attack, was the only
witness the government called to testify
about the robbery and murder./2 His
direct testimony is summarized below.

 McAfee was riding his bicycle home from
Garfield Park in Chicago on September 6,

1993, at approximately 10:45 p.m. He stopped at the corner of Franklin and Drake and talked to a girl who was leaning out of a window. After about a minute, the conversation ended, and McAfee saw four men and a woman standing across the street outside the senior citizens' home, drinking beer. Although he did not recognize the woman, he recognized the four men--Randy, Revell (identified as "Vell"), Keater, and Corey./3

While still looking across the street, McAfee saw Eugene Oliver leave the senior citizens' home and walk toward Franklin. Randy, Vell, Keater, and Corey followed Oliver. As they walked to the corner of Franklin and Drake, Randy approached McAfee and asked if he could use his bicycle. After McAfee refused, Randy simply took the bicycle and rode off. McAfee gave chase.

Meanwhile, Oliver had turned left onto Franklin and walked to Central Park. On McAfee's bicycle, Randy caught up with Oliver and threw the bicycle at Oliver's legs, which caused Oliver to fall to the ground. Although McAfee could not remember where they came from, Vell, Keater, and Corey had by this point made their way to Central Park. All four began to beat Oliver. They repeatedly kicked Oliver in the face and on his side. Randy picked up the bicycle and threw it on Oliver's head three times. The beating lasted about a minute, and left Oliver motionless on the ground. Afterwards, Randy reached into Oliver's pocket and removed something.

As Randy, Vell, Keater, and Corey left the scene of the attack, they walked past McAfee, who had seen the attack from across the street. Randy told McAfee, "Don't say nothing, don't tell nobody." McAfee also noticed that Randy had a $20 bill in his hand, and he heard Randy talking about purchasing some beer.

Once they were gone, McAfee retrieved his bicycle from the park./4 The crank was so bent he had to push the bicycle home. Because of Randy's threat, McAfee kept quiet about Oliver's beating until he was questioned by the police.

At trial, during cross-examination, defense counsel questioned McAfee about a

juvenile manslaughter adjudication that arose out of his accidental shooting of a friend, for which he was still on probation. McAfee admitted that he first lied to the police regarding his role in his friend's death because he was scared. With respect to the Oliver beating, he admitted that he was scared when the police brought him in for questioning. Defense counsel also elicited testimony from McAfee suggesting that the police may have initially suspected him as having been involved in the attack on Oliver./5

The four witnesses called by the defense told a different story. Antonio Shanklin testified that he saw four or five boys who he had never seen before beating Oliver. He identified McAfee as the one who picked up a bicycle and hit Oliver with it. Afterwards, McAfee fixed the chain on the bicycle and rode off, joining the other boys who had begun to flee the scene. As they fled, they went past Shanklin, and he had a good chance to look at them.

Shanklin also testified that he had known the Bosses for about three years, and he was certain they were not among the group of boys fleeing the scene. In fact, he stated that he saw Revell on the east side of Central Park while Oliver was being beaten on the west side of the park. On cross-examination, Shanklin admitted that he came forward to testify at the request of the Bosses' family./6

Contina Hill, Randy's girlfriend and his child's mother, stated that on the day of the crime, Randy was with her at the apartment she shares with her mother and other family members, enjoying a Labor Day barbeque. He left the apartment only twice. Sometime in the afternoon, he went downstairs to the apartment of Corey Carter's cousin, Gregory Carter. That night, he went out with Gregory and two other men and returned a short time later with beer. Randy left for good much later that night. Sometime late that night Revell came by and spent some time at the Hills' apartment. Janice Hill, Contina's sister, corroborated her sister's testimony and added that when Randy left the apartment the second time, he was gone approximately 15 minutes.

Tonya Gist, a neighbor of the Hills,

testified that on the night of the crime, near Central Park, she saw McAfee fighting with an older man from the senior citizens' home. She went home, and when she arrived, she saw Randy sitting on the back porch she shared with the Hills. He was still there when she locked the gate later that evening. Also, at some point during the evening, Gist saw Revell on the porch.

On the last day of the Bosses' two-day trial, the state gave the Bosses an investigative report summarizing an interview of Janice Hill conducted four days before the trial began. This report revealed that Janice told the state investigator information unknown to defense counsel: (1) that McAfee had been bragging to people about what he and his friends had done to Oliver; and (2) that McAfee had told Richard Mitchell that he had only implicated Randy, Revell, and the other defendants in the Oliver attack so that he would not get in trouble. Based on this information, defense counsel moved for a continuance so that they could locate Richard Mitchell. The trial judge denied the motion.

The trial went forward, and the jury found Randy and Revell guilty of both first-degree murder and robbery. After the trial, but before sentencing, new defense counsel followed up on the Janice Hill information. Counsel located and talked to Richard Mitchell. According to Mitchell, McAfee admitted that he, not the defendants, had committed the offense. Counsel also collected written statements from Marcus Fowler and Ricky Boss to the same effect. Based on this material, counsel filed a motion for a new trial,/7 but the trial judge denied the motion. The trial judge then sentenced Randy to concurrent prison terms of fifty years for murder and seven years for robbery, and sentenced Revell to concurrent prison terms of forty years for murder and seven years for robbery.

B. Post-Conviction Proceedings

The Bosses appealed their convictions to the Illinois Appellate Court, claiming, among other things, that the State's Attorneys prosecuting their case violated Brady v. Maryland, supra, by withholding the investigative report summarizing Janice Hill's interview with the state

investigator. The Appellate Court affirmed their convictions. In rejecting the Bosses' Brady claim, the Appellate Court concluded that the Bosses could satisfy none of the requirements for a Brady claim, as the investigative report was not suppressed by the state, favorable to the defense, or material, under Brady. The Bosses sought review in the Illinois Supreme Court, but their petition was denied without an opinion.

The Bosses then turned to federal court and filed a petition for a writ of habeas corpus in the District Court for the Northern District of Illinois, raising the same claims. Concluding that the information in the investigative report was not suppressed by the state, the district court denied the writ. The district court granted them a certificate of appealability, and the Bosses filed this appeal with respect to their Brady claim./8

II. ANALYSIS

A. Habeas Corpus and 28 U.S.C. sec. 2254(d)(1)

In considering a habeas corpus petition filed by a state prisoner that challenges the prisoner's conviction or sentence on legal grounds, federal courts employ the standards set forth in 28 U.S.C. sec. 2254(d)(1). Under this provision, a federal court may grant a writ of habeas corpus only if the adjudication of the prisoner's claims in state court resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." As the Supreme Court explained in Williams v. Taylor, 529 U.S. 362 (2000), section 2254(d)(1) establishes two independent grounds on which a federal court can grant habeas corpus relief: (1) if a state court decision is contrary to clearly established federal law, as determined by the Supreme Court, or (2) if a state court decision involves an unreasonable application of clearly established federal law, as determined by the Supreme Court. Id. at 404-05; see also Washington v. Smith, 219 F.3d 620, 627-28 (7th Cir. 2000).

The "contrary to" standard requires a

state court decision to be "substantially different from the relevant precedent of [the Supreme Court]." Williams, 529 U.S. at 405. For example, a state court decision applying a rule that contradicts the governing law set forth by the Supreme Court would qualify, as would a decision that involves a set of facts materially indistinguishable from a Supreme Court case that arrives at a different result. Id. at 405-06. By contrast, a state court decision that draws from Supreme Court precedent the correct legal rule and applies it in a factually distinguishable situation will not satisfy the "contrary to" standard, no matter how misguided the decision's ultimate conclusion. Id. at 406-07.

Errors in the application of Supreme Court precedent are governed by the "unreasonable application of" standard. "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case" qualifies as a decision involving an unreasonable application of clearly established federal law. Id. at 407-08. Whether an application of federal law is unreasonable is not a simple question to answer, as "unreasonable" is a difficult term to define without reference to a particular set of facts. Still, Williams provides guidance. First, reasonableness is judged objectively, not subjectively. Id. at 409-10. Thus, the fact that judges may disagree about the proper application of a precedent does not affect the reasonableness of a particular application of that precedent. Second, "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410 (emphasis in original). Therefore, a federal court may not grant habeas corpus relief simply because it has independently concluded that the relevant state court decision misapplies clearly established federal law. The decision's application of Supreme Court precedent must be so erroneous as to be unreasonable.

In Williams, the Supreme Court also explained the meaning of the phrase "clearly established Federal law, as determined by the Supreme Court of the United States." It characterized the phrase as referring to "the holdings, as

opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id. at 412. Therefore, in order to grant habeas corpus relief under section 2254(d)(1), a federal court must be able to point to the holding of a Supreme Court decision handed down before the state courts issued the decision under review.

B.  Brady Violation

 With these standards in mind, we turn to the Bosses' Brady claim. Under Brady v. Maryland, supra, and its progeny, the prosecution has an affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. Kyles v. Whitley, 514 U.S. 419, 432-34 (1995); United States v. Bagley, 473 U.S. 667, 674-75 (1985); Brady, 373 U.S. at 87. The suppression of such evidence deprives the defendant of a fair trial and thus violates due process. Brady, 373 U.S. at 86-87. To establish a Brady violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial. United States v. Walton, 217 F.3d 443, 450 (7th Cir. 2000); United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996). The state does not contest the Bosses' contention that the investigative report summarizing Janice Hill's interview with the state investigator was favorable to the defense./9 Therefore, we focus our attention on suppression and materiality, the other two elements of a Brady claim.


 1.  Suppression.

 Evidence is suppressed for Brady purposes only if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. United States v. Earnest, 129 F.3d 906, 910 (7th Cir. 1997); Morris, 80 F.3d at 1169-70; United States v. Zambrana, 841 F.2d 1320, 1340 (7th Cir. 1988). The state here contests whether the information Janice Hill related to the state investigator was

available to the Bosses through the exercise of reasonable diligence. Specifically, the state argues that Janice Hill was a defense witness and, therefore, the Bosses had ample access to any information she possessed. Both the district court and the Illinois Appellate Court accepted this argument and found that the prosecution had not suppressed the evidence in the investigative report.

We are of the view, however, that the state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence. We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for Brady purposes. To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement. Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.

Putting aside these situations in which it would be nearly impossible for defense counsel to discover evidence in the possession of defense witnesses, accepting the state's position would place a burden on defense counsel that goes far beyond what reasonable diligence demands. Defense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands the witness's role to be in the case. However, defense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case. A contrary conclusion would require defense counsel to conduct a fishing expedition with every defense witness (and potential defense witness). Reasonable diligence does not require such a practice.

We also find it significant that a defense witness's knowledge is quite

different from the type of evidence typically found to be available to defense counsel through the exercise of reasonable diligence. In the typical reasonable diligence case, the question is whether defense counsel had access to the document containing the Brady material, through an open file policy, for example. See, e.g., United States v. White, 970 F.2d 328, 337 (7th Cir. 1992). In cases like the present one, the question is whether defense counsel had access to Brady material contained in a witness's head. See, e.g., Crivens v. Roth, 172 F.3d 991, 997 (7th Cir. 1999). Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. This stretches the concept of reasonable diligence too far.

Still, the ultimate question we must answer in this case is whether the Illinois Appellate Court's ruling--thatbecause Janice Hill was a defense witness, the information she possessed was available to the Bosses through the exercise of reasonable diligence--"was contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court." 28 U.S.C. sec. 2254(d)(1). Brady and its most notable progeny (United States v. Agurs, 427 U.S. 97 (1976); United States v. Bagley, supra; Kyles v. Whitley, supra), all of which were decided prior to the conclusion of the Bosses direct appeal, represent the relevant, clearly established federal law./10 And, the Appellate Court's ruling is not so inconsistent with these cases that it can be characterized as "contrary to" them. Thus, we focus on whether the Appellate Court's decision is an "unreasonable application of" Brady and its progeny. We conclude that it was.

When faced with the task of determining whether a particular application of Supreme Court precedent is unreasonable, we have often taken a more pragmatic approach to answering the question, scrutinizing the practical operation and effect of the principles at issue in the particular facts of the case. See, e.g.,

Miller v. Anderson, 255 F.3d 455, 456-59 (7th Cir. 2001); Redmond v. Kingston, 240 F.3d 590, 591-92 (7th Cir. 2001); Washington v. Smith, 219 F.3d 620, 627-35 (7th Cir. 2000). We ask whether the decision is "at least minimally consistent with the facts and circumstances of the case" or "if it is one of several equally plausible outcomes," Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997); Hall v. Washington, 106 F.3d 742, 749 (7th Cir. 1997), granting a writ of habeas corpus if the determination is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary" as to be unreasonable. Hall, 106 F.3d at 749.

For instance, in Redmond v. Kingston, supra, this court considered whether a Wisconsin court of appeals' decision to affirm a state trial court's exclusion of evidence (that the alleged statutory rape victim in the case had lied about a prior report of forcible rape) was an unreasonable application of Supreme Court Confrontation Clause precedent. The defendant was on trial for allegedly trading cocaine for sex with the minor, who was institutionalized at the drug rehabilitation center where the defendant was a counselor. Her testimony was the only evidence of the defendant's guilt. The Wisconsin court upheld the exclusion of the prior false forcible rape report against the constitutional challenge, stating that it was cumulative of other credibility evidence and was confusing (the prior incident involved consent, which was not an element in that case). Therefore, they concluded that its probative value was outweighed by its inflammatory and prejudicial nature, justifying exclusion under the state's rape-shield law and the Constitution.

We held that this decision was unreasonable. Redmond, 240 F.3d at 591. The "other credibility" evidence was that the minor began using drugs at the age of twelve, had stolen and occasionally danced to get money for cocaine, had run away from the institution, skipped school and told lies in the past. We stated that "none of the other evidence either involved a false charge of being sexually assaulted or furnished a motive for such a charge." Id. Thus, the nature of the credibility evidence excluded was

entirely different from that admitted, and we rejected as unreasonable the Wisconsin court's suggestion that the evidence was cumulative.

In addition, we concluded that there was no danger of confusion to the trier of fact, and that the assumption upon which the Wisconsin court made its determination was faulty. The Wisconsin court believed that admitting the evidence of the prior false rape report would require (or permit) the victim to testify that she had consensual sex with the alleged rapist, and that would lead to confusion and misperception of issues in the case. Id. at 592. We rejected this conclusion, because the only evidence relevant to the case was that the victim had made up a story of forcible rape within the preceding year. This evidence did not require any inquiry into whether there was sexual intercourse, and we saw no reason why anyone would reach a conclusion to the contrary. Id. We held that the evidence was "highly probative, noncumulative, nonconfusing, [and] nonprejudicial . . . [and] vital to the central issue in the case," and should not have been excluded. The defendant had a constitutional right to have it admitted. Id.

As our analysis in Redmond illustrates, careful review of the evidence and reasons supporting the decision is required in determining the reasonableness of a state court's decision. It is that type of examination in which we engage today.

Here, the Illinois Appellate Court's ruling that reasonable diligence required the Bosses' counsel to ask Janice Hill about what McAfee had been saying around the neighborhood regarding the attack on Eugene Oliver is an unreasonable application of Brady and its progeny. The Bosses' counsel could not have reasonably expected Janice Hill to have knowledge regarding this topic. Janice was simply an alibi witness whom defense counsel planned to have testify to Randy's whereabouts on the night of the crime. Nothing about her role in the case suggested that she might also have knowledge regarding what the prosecution's chief witness was saying around the neighborhood.

Holding that reasonable diligence requires defense counsel to ask witnesses about matters of which counsel could not have reasonably expected a witness to have knowledge  is inconsistent with the aim of Brady and its progeny. Brady and its progeny strike a careful balance between maintaining an adversarial system of justice and enforcing the prosecution's obligation to seek justice before victory. See, e.g., Kyles, 514 U.S. at 439 ("Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result."); Bagley, 473 U.S. at 675 n.6 ("The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." (internal quotation marks and ellipses omitted)); Brady, 373 U.S. at 87-88 ("A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . .").

Allowing the government to withhold favorable material evidence that it receives from defense witnesses upsets the balance Brady and its progeny strike. The consequence of adopting the state's position would work a real injustice. In effect, it would punish the defense for not obtaining evidence it had no reason to believe existed.

The Illinois Appellate Court's ruling regarding what reasonable diligence requires is also inconsistent with Brady and its progeny in a more particular sense. The Supreme Court has described the Brady rule as applying to information known to the prosecution but "unknown to the defense." Kyles, 514 U.S. at 437; Bagley, 473 U.S. at 678 (opinion of

Blackmun, J.); Agurs, 427 U.S. at 103. This description suggests a focus on actual knowledge as the key consideration in determining whether evidence is available to the defense for Brady purposes. Still, it would be a reasonable application of this precedent to hold that the Brady rule does not apply to information the defense can be expected to discover. Refusing to characterize as Brady material information the defense can be expected to discover serves to weed out incredible claims of ignorance, to prevent sandbagging, and is consistent with a focus on actual knowledge. Further extension of the limits on Brady material to include information the defense could not be expected to discover cannot be reconciled with such a focus. See 5 Wayne R. LaFave et al., Criminal Procedure sec. 24.3(b), at 486-87 (2d ed. 1999) (drawing a similar distinction). Extending thelimits on Brady material in this way would be inconsistent with what the Supreme Court has said regarding when undisclosed evidence is available to the defense.

Finally, the state does not cite, and we have not found, a single case applying Brady and its progeny in the fashion advanced by the state. Of the few cases we have discovered involving whether the defense had access to information possessed by a witness, none demanded inquiry into matters defense counsel could not have been expected to ask about. See, e.g., Crivens, 172 F.3d at 997; United States v. Hamilton, 107 F.3d 499, 510 (7th Cir. 1997); cf. United States v. Senn, 129 F.3d 886, 892-93 (7th Cir. 1997); United States v. Rodriguez-Andrade, 62 F.3d 948, 952 (7th Cir. 1995); United States v. Hedgeman, 564 F.2d 763, 769 (7th Cir. 1977). In fact, in Hamilton, this court, finding thatcertain information possessed by a witness was available to the defense for Brady purposes, made clear that it was more than reasonable to expect an investigator hired by the defense to inquire after the information at issue. 107 F.3d at 508-09 (quoting the district court's finding that "'any investigator worth his or her salt would have asked Mr. Painter had he given any statements'"). This authority (and lack of authority) confirms our belief that it would be an unreasonable application of Brady and its progeny to rule that

information possessed by a defense witness is available through the exercise of reasonable diligence where that information is not of a type defense counsel could reasonably expect that witness to possess.

In sum, we find that the Illinois Appellate Court unreasonably applied Brady and its progeny in ruling that reasonable diligence required the Bosses' counsel to ask Janice Hill about what McAfee had been saying around the neighborhood regarding the attack on Oliver. And we also conclude that the Bosses have satisfied the standard for habeas corpus relief with respect to the suppression requirement for a Brady claim./11

2. Materiality.

Turning to the final prong, suppressed evidence is material for Brady purposes "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles, 514 U.S. at 433-34 (quoting Bagley, 473 U.S. at 682 (opinion of Blackmun, J.)). Such a probability exists where the suppressed evidence, or evidence that is derived directly from the suppressed evidence, undermines confidence in the outcome reached. Kyles, 514 U.S. at 434; Bagley, 473 U.S. at 682 (opinion of Blackmun, J.); see also United States v. Dimas, 3 F.3d 1015, 1018 (7th Cir. 1993).

The state argues that the evidence discovered on the basis of the information Janice Hill provided to the state investigator is not material because it is cumulative of the trial testimony of Antonio Shanklin and Tonya Gist exculpating one or both of the Bosses and inculpating McAfee./12 According to the state, there is no reason to think the jury would not have disregarded this new evidence just as it disregarded the similar evidence it did hear. The Illinois Appellate Court embraced the state's argument regarding this issue without reservation, but the district court declined to accept or reject the argument.

In our view, the state's argument mischaracterizes the nature of the evidence the Bosses discovered on the

basis of Janice Hill's statements to the state investigator. This evidence is not simply cumulative; it differs in at least two significant ways from the testimony of Antonio Shanklin and Tonya Gist. First, according to the uncontradicted representations of the Bosses' counsel, two of the three witnesses discovered (Richard Mitchell and Marcus Fowler) are neutral and disinterested witnesses, which distinguishes them from Shanklin and Gist who, as the prosecution emphasized at trial, both have connections to the Bosses. We have previously recognized that independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict. Washington v. Smith, 219 F.3d 620, 634 (7th Cir. 2000); Montgomery v. Petersen, 846 F.2d 407, 415 (7th Cir. 1988).

Second, the testimony that the newly discovered witnesses would have given (that McAfee admitted participating in the attack on Oliver and admitted that the Bosses were not involved) is of a different nature than that given by Gist and Shanklin. It involves a confession by McAfee, the state's key witness, that he committed the crime the defendants were charged with and that he lied about the defendants' participation in that crime. This is different and in many ways more significant evidence than testimony that two eyewitnesses believe they saw McAfee take part in the attack on Oliver. Cf. Redmond, 240 F.3d at 591-92 (discussed supra).

For both these reasons, the evidence the Bosses discovered on the basis of Janice Hill's statements to the state investigator cannot be characterized as simply cumulative. It is difficult to say with certainty that the jury would have disbelieved the testimony of the newly discovered witnesses just as it disbelieved Gist and Shanklin. Making such a statement becomes impossible when we take into account how closely balanced the evidence presented at trial was. The evidence presented by the state was not overwhelming. As we have noted, McAfee's testimony was the state's only evidence connecting the Bosses to the attack on Oliver. Therefore, weighing McAfee's credibility was crucial to the jury's

determination. The evidence the Bosses discovered on the basis of Janice Hill's statements presents a direct and substantial challenge to McAfee's credibility and undermines our confidence in the jury's verdict. Therefore, we conclude that the withheld evidence was material for Brady purposes.

Although the Illinois Appellate Court's decision reaching the opposite conclusion is not "contrary to" clearly established Supreme Court precedent on Brady materiality, the Appellate Court's decision is an "unreasonable application of" that precedent. The Appellate Court did not undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial, which is required under Kyles v. Whitley, supra. In Kyles, the Supreme Court exhaustively examined the suppressed evidence as well as the evidence introduced at trial. It then carefully assessed what purposes the suppressed evidence might have served and how that evidence might have affected the jury's consideration of the evidence that was introduced. 514 U.S. at 441-54.

By contrast, the Illinois Appellate Court's discussion of whether the Bosses could satisfy the materiality requirement is little more than a conclusion that the excluded evidence, because it was cumulative, was not likely to be believed. The court did not consider the impeachment value the new evidence might have had or the differences between the new evidence and the testimony of Shanklin and Gist. Nor did the court assess the relative strength of the state's case against the Bosses or how the new evidence might call the state's case into question. As we noted above, all of these considerations have considerable significance in this case. But we do not conclude that the Illinois Appellate Court's decision was unreasonable because not well-reasoned. Accord Hennon, 109 F.3d at 334-35. Rather, we believe that the Illinois Appellate Court's conclusion, that the evidence discovered on the basis of Janice Hill's statements was not material because cumulative, was unreasonable on the facts and circumstances of this case. Therefore, we find that the Bosses have

satisfied the standard for habeas corpus relief with respect to the materiality requirement for a Brady claim.

III.   CONCLUSION

As the Bosses have satisfied the standard for habeas corpus relief with respect to each of the requirements for a Brady claim, the district court erred in denying the Bosses writs of habeas corpus. Accordingly, we Reverse the judgment of the district court and Remand the case with instructions to grant the Bosses writs of habeas corpus unless the state retries them within 120 days.

FOOTNOTES

/* Since the filing of this appeal, both petitioners have been moved to new prisons; Randy Boss to Pickneyville Correctional Center and Revell Boss to Hill Correctional Center. We have substituted the wardens of those institutions, Guy Pierce and Mark A. Pierson, respectively, as the respondents in this case pursuant to Fed. R. App. P. 23(a).

/1 Collectively, we refer to them as the Bosses. To avoid confusion, we will use first names when referring to them separately. We will also follow this practice for individuals in this opinion who share the same last name.

/2 The state called four other witnesses: Chicago Police Detective Gene Harris; Oliver's girl-friend, Beulah Williams; Assistant Cook County Medical Examiner Larry Simms; and paramedic Larry Del Dotto. But none of these witnesses offered testimony linking the Bosses to the attack on Oliver.

/3 He later identified them in court.

/4 The bicycle was introduced in evidence, and McAfee identified it as the bicycle used in the attack.

/5 Detective Harris, in his testimony, insisted that McAfee was merely a witness, but police records and certain circumstances surrounding McAfee's questioning by the police cast some doubt on that assertion.

/6 Shanklin, like each of the defense witnesses, also admitted that he never contacted the police or the State's Attorney's Office about his knowledge regarding the crime. However, Shanklin, and both Hill sisters, testified that they did speak to the Bosses' attorneys not long after the Bosses were charged.

/7 Actually, defense counsel's second amended motion for a new trial, supplementing two previous motions, incorporated this newly discovered material.

/8 Under 28 U.S.C. sec. 2253(c), a habeas corpus petitioner challenging her conviction or sentence may appeal an adverse district court decision only with respect to those issues on which she has been granted a certificate of appealability. The Bosses ask us to expand their certificate of appealability to include various claims in addition to their Brady claim, but on none of these claims have the Bosses made "a substantial showing of the denial of a constitutional right," as they must before a certificate of appealability can be issued, 28 U.S.C. sec. 2253(c)(2). Therefore we deny the Bosses' request to expand their certificate of appealability.

/9 Nor could it. As the district court recognized, the information in the investigative report has, at the very least, impeachment value, and impeachment evidence is favorable to the defense, Bagley, 473 U.S. at 676; Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999). In considering this element of the Bosses' Brady claim, the Illinois Appellate Court appears to have proceeded on the assumption that suppressed evidence must be exculpatory to satisfy the requirements of Brady. Such an assumption is contrary to then clearly established Supreme Court precedent. See Bagley, 473 U.S. at 676; Giglio v. United States, 405 U.S. 150, 154-55 (1972).

/10 We recognize that the Supreme Court has decided other cases involving Brady claims, see, e.g., Strickler v. Greene, 527 U.S. 263 (1999); Wood v. Bartholomew, 516 U.S. 1 (1995); Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Weatherford v. Bursey, 429 U.S. 545 (1977); Moore v. Illinois, 408 U.S. 786 (1972); Giglio v. United States, 405 U.S. 150 (1972), but the three cited are the most significant decisions that identify the legal standards governing Brady claims. See 5 Wayne R. LaFave et al., Criminal Procedure sec. 24.3(b), at 473-90 (2d ed. 1999) (relying predominantly on these cases in describing the relevant standards).

/11 We need not address Revell Boss's alternative argument that his attorney acted with reasonable diligence because Janice Hill was Randy's alibi witness.

/12 The state does not directly address the materiality of Janice Hill's statements themselves, presumably on the assumption that her statements would be inadmissible hearsay. We need not re-

solve this evidentiary issue because the evidence discovered on the basis of Janice's statements is material standing alone.


 Flaum, Chief Judge, dissenting.  Like the majority, I share a sense of concern regarding the circumstances of this case. Given the facts before us, the preferable course of action would have been for the trial judge to grant the defense a continuance so that they could have further investigated any additional information which might have been provided by witness Janice Hill. Nevertheless, I am unable to conclude that the Bosses are entitled to a writ of habeas corpus under the standard mandated by 28 U.S.C. sec. 2254(d)(1) as interpreted in Williams v. Taylor, 529 U.S. 362, 402-13 (2000). In my judgment, the Illinois Appellate Court's determination, that no evidence from Hill was suppressed by the prosecution since she was a cooperative defense witness, cannot be labeled an unreasonable application of Brady in light of the controlling jurisprudence.

 I agree with the majority that the Illinois court's decision was not "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. sec. 2254(d)(1). Thus, I address only whether the decision is an unreasonable application of such law. The Illinois Appellate Court's decision fits into a line of circuit cases rejecting Brady claims based on evidence that could have been discovered by the defense with reasonable diligence, see, e.g., Chandler v. Moore, 240 F.3d 907, 915 (11th Cir. 2001); United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001); Johns v. Bowersox, 203 F.3d 538, 545 (8th Cir. 2000), or where the defense knew or should have known of the essential facts necessary to obtain the exculpatory evidence, see, e.g., Coleman v. Mitchell, 244 F.3d 533, 541 (6th Cir. 2001); United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000). These cases present a reasonable interpretation of Brady since a Brady violation can occur only if evidence is suppressed, and, generally, evidence available to the defense cannot be so characterized.

 In deciding whether potentially exculpatory evidence could have been found through reasonable diligence, our court focuses on whether the defense had knowledge of the material containing such evidence and the same degree of access as the prosecution. See United States v. Parks, 100 F.3d 1300, 1307 (7th Cir. 1996); United States v. Morris, 80 F.3d 1151, 1170 (7th Cir. 1996). To

defeat a Brady claim, the defense need not be aware of the specific details of the exculpatory information or precisely what it is so long as the defense knew of and had access to the material that contained, or the witness who possessed, such information. See, e.g., United States v. Senn, 129 F.3d 886, 892-93 (7th Cir. 1997); Parks, 100 F.3d at 1037.

Respectfully, I cannot find the Illinois Appellate Court's decision wanting under these standards. Both of the Bosses clearly were aware of Janice Hill, as she testified in favor of one of the defendants, Randy. Since Randy and Revell were tried jointly, Revell must have also known of Hill. Additionally, the Bosses had at least as much access to Hill as the state did considering that she was one of their witnesses. The defense was aware that Hill had evidence relevant to the crime and had ample opportunity to interview Hill in order to obtain all of the information she knew about Eugene Oliver's death, including Robert McAfee's involvement. The Bosses have not demonstrated or suggested that Hill was uncooperative or that they otherwise would have had more difficulty in obtaining information from Hill than the prosecution did.

The majority seeks to cabin the need for the defense to be reasonably diligent through a variety of distinctions that are, in my view, unavailing. The reasonable diligence requirement has frequently been applied to evidence that was unwritten. See, e.g., United States v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997); Hoke v. Netherland, 92 F.3d 1350, 1355-56 (4th Cir. 1996). Indeed, obtaining information through questioning often requires less diligence than sorting through papers. Thus, the fact the proposed evidence in question was contained in Hill's mind rather than a document is not a reason for excusing the defense's not uncovering information known by one of their own witnesses.

In addition, a specific lead is not necessary for a reasonably diligent defendant to discover exculpatory information; knowledge of and access to a witness usually are sufficient. See, e.g., Wright v. Hopper, 169 F.3d 695, 702 (11th Cir. 1999); Hoke, 92 F.3d at 1355-56; United States v. Hicks, 848 F.2d 1, 4 (1st Cir. 1988); United States v. Grossman, 843 F.2d 78, 85 (2d Cir. 1988). The majority's quotation from our decision in United States v. Hamilton, 107 F.3d 499, 508-09 (7th Cir. 1997) demonstrates this proposition. Hamilton does not rest on the defense's possession of information indicating what specific questions a witness should have been asked. Rather, by the simple fact that the bank teller in Hamilton was a witness the defense should have

known to ask whether he had given any prior statements to the police. Id. Similarly, in the days before trial the Bosses' attorneys readily could have asked Hill if she had learned any additional information relevant to the case since their previous interview.

The Illinois Appellate Court's decision does not disrupt the prosecutor's duty to seek justice before victory. Brady was never meant to displace our adversary system of justice, United States v. Bagley, 473 U.S. 667, 675 (1985), and does not require the prosecution to assist in presenting the defense's case, United States v. White, 970 F.2d 328, 337 (7th Cir. 1992). Even after Brady, defendants are still required to conduct thorough investigations of witnesses which they know may have useful information.

Furthermore, and perhaps most significantly, cases denying Brady claims often have relied on the fact that the witness with the exculpatory material was either a defense witness or cooperated with the defense. See Stockton v. Murray, 41 F.3d 920, 925 (4th Cir. 1994); United States v. Dean, 722 F.2d 92, 95 (5th Cir. 1983); United States v. Natale, 526 F.2d 1160, 1171 (2d Cir. 1975). Against the backdrop of this case law, it is difficult to conclude that the Illinois Appellate Court unreasonably applied the Supreme Court's directives regarding Brady.

The foregoing is not meant to suggest in any way a broad, strict rule that Brady is in all circumstances inapplicable to information obtained by the prosecution from defense witnesses. As the majority appropriately recognizes, a defense witness may forget information, may be reluctant to provide certain information to the defendant, or may become hostile to the defense, cf. In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 893 (D.C. Cir. 1999). Perhaps the refusal to recognize the possibility of a Brady violation in such circumstances would be an unreasonable refusal to extend a legal principle. Cf. Williams, 529 U.S. at 408-09. However, we are not presented with such circumstances. The Bosses have made no claim that Hill was unwilling or unable to provide the information she possessed. Hence, based on the record before us, I am simply unable to find sufficient support for the grant of the writ of habeas corpus and must therefore respectfully dissent.