In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-1742

ERNEST C. COLLIER,

*Petitioner-Appellant,*

*v.*

CECIL DAVIS, SUPERINTENDENT
OF THE INDIANA STATE PRISON,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 00 C 139—**Allen Sharp**, *Judge.*

ARGUED APRIL 3, 2002—DECIDED AUGUST 29, 2002

Before COFFEY, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Ernest T. Collier, after unsuccessful direct and post-conviction appeals of his murder and criminal recklessness convictions in Indiana state court, seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254. After the district court denied Collier's petition and declined to issue a certificate of appealability, we issued a certificate of appealability to determine whether the State's alleged failure to disclose an understanding or informal agreement of leniency in exchange for the key witness's testimony violated *Brady v. Maryland,*

373 U.S. 83 (1963). Because Collier has failed to produce sufficient evidence to support his *Brady* claim, we affirm the district court's judgment.

## I. BACKGROUND

A. Facts

More than thirteen years ago, Frederick McGuire was shot in the head at close range in front of his home in Indianapolis, Indiana. He died three days later. Although nobody saw the shooting, the State's key witness, James Merrill, testified that Collier was at the McGuire home and possessed a gun at the time of the shooting. The relevant portion of his testimony follows.

After a full day of drinking and driving around Indianapolis, Merrill went with Collier to a local fast-food restaurant, where Collier's ex-girlfriend worked. While they were there, Collier got into an argument with his ex-girlfriend, and then left with Merrill. They drove for a couple of miles and stopped when they reached a house on 40th and Webster in Indianapolis. Chris Hollins, Jr. ("Junior"), Collier's ex-girlfriend's brother, was in front of the house. Junior was also a friend of Frederick McGuire, the victim. Collier got out of the car, began arguing with Junior, and apparently threatened to shoot him. While they were arguing, Chris Hollins, Sr. came outside and told Collier, "You're not the only one who has a gun." The elder Hollins went back inside the house and then Collier returned to the car. At this point Merrill noticed Collier was carrying a gun. Collier placed the gun in the car console.

According to Merrill, he and Collier left Junior's home and headed North to 42nd and Catherwood in Indianapolis. Collier asked Merrill to drive and the two changed positions. When they got to 42nd and Catherwood, Collier

asked Merrill to slow down as they approached a house. Collier got out of the car and asked Merrill to turn the car around. Merrill complied and heard a gunshot. At that point, he also noticed that the car's open console, where Collier had originally laid his handgun, was empty. Merrill drove back to the house on 42nd Street, where he saw Collier waiting in the yard. Collier returned to the car, sat down and said, "That's the way I like to play." Merrill's testimony linked Collier to the murder and directly contradicted Collier's claim at trial that Merrill was the shooter.

Merrill was the only witness who linked Collier, in possession of a gun, to Frederick McGuire's home at the time of the shooting. But other witnesses provided testimony that was consistent with Merrill's. Michael Johnson, who lived across the street from McGuire, saw Collier's car approach, then saw someone he was later unable to identify exit the car and shoot McGuire. Another witness, Cory Wills, testified that he saw Collier in a beige car in the vicinity of the McGuire house on the afternoon of the shooting. According to Wills, Collier was sitting in the passenger's seat. A third witness, Junior, stated that he saw Collier with a gun on the afternoon of the shooting.

The police caught Collier the evening of the murder. At the time of his arrest, Collier was in the passenger's seat of a two-door brown car. Collier did not have a gun, and the results of a gunshot residue test performed on his hands shortly after the arrest were negative. But after a search, the police found a slip of paper on Collier with Merrill's contact information. Merrill was apprehended three days later. Although Merrill had been driving in the car with Collier on the afternoon of the shooting and was placed and identified in a lineup, he was never charged with the shooting.

B.  Procedural History

   1.  Trial

The critical issue at Collier's trial was Merrill's testimony linking Collier to a firearm and placing him at the scene of the murder. During cross-examination, Collier's counsel did not ask Merrill whether he had an agreement with the State to testify against Collier in exchange for leniency or other benefits. When the prosecutor asked Merrill on redirect if he had entered into any agreements in exchange for his testimony, Merrill responded, "I don't know, [the detective], just said he talked to my mom. . . ."

Collier took the stand after Merrill testified. Collier agreed with much of Merrill's version of that day's events. Their testimony began to diverge when recounting the incidents relating to the shooting. Collier claimed that he had only a baseball bat in the car and did not possess a gun. Collier testified that he was driving the car and dropped Merrill off at the victim's house. When Merrill returned to the car, Merrill had a gun in his hand. Merrill grabbed Collier and said urgently, "Let's go, man." Although Merrill's and Collier's testimony were diametrically opposed, Merrill was never questioned about the possibility of his being Frederick McGuire's murderer. Ultimately, the jury found Collier guilty of murder, criminal recklessness, and carrying a handgun without a license.

   2.  Post-conviction proceedings

Collier appealed his convictions directly to the Indiana Supreme Court. He claimed there was insufficient evidence to support the verdict and that the verdict was contrary to law. The Indiana Supreme Court affirmed the convictions. *Collier v. State*, 562 N.E.2d 722 (Ind. 1990).

Six years later, Collier claimed that he discovered that a week after the McGuire shooting, Merrill had pled guilty

to a lesser charge in a burglary case in which he testified against his co-defendant. Collier also said that he discovered Merrill had a disorderly conduct case pending during Collier's murder trial which was dismissed shortly after Collier's conviction and that a criminal recklessness case also pending against Merrill was dismissed a year after Collier's conviction. With this information in hand, Collier filed a post-conviction petition arguing that his defense counsel had been ineffective, the State had withheld *Brady* material, and the State induced Merrill to testify falsely in order to obtain Collier's conviction.

Three post-conviction hearings were held; only two are relevant here. During one post-conviction hearing, Merrill testified that although he was arrested in connection with the McGuire murder he was never charged. Merrill also testified that based on the detective's statements during the post-arrest interview, it was his understanding that he had to "either testify or confess."

During another post-conviction hearing, Collier's former trial counsel, Frederick J. Frosch, testified that although he never spoke to Merrill before trial, he had a conversation with one of the prosecutors.[1] Although Frosch never spoke with lead prosecutor Plath about any alleged understandings or agreements with Merrill, Frosch claimed that he did speak with the first prosecutor, who told him that the investigating detectives made a "verbal statement to [Merrill] that he would not be charged if he was cooperative." Frosch also acknowledged that at the time of the trial he knew that Merrill had received, pursuant to a plea agreement, a sentence of two years' probation for his burglary conviction. After Frosch testified, arresting detec-

---

[1] Two prosecutors were assigned to this case. The first prosecutor performed only pre-trial work and Richard Plath tried the case and testified at a post-conviction hearing.

tive Prater testified and said that he never made any promises to Merrill in connection with the McGuire murder and that any agreements made with Merrill did not involve the Collier case.[2]

After considering the evidence presented at these post-conviction hearings, the superior court found that the State complied with the rules of discovery and the evidence "convince[d] the court that no promise was made to Merrill in return for his testimony." The superior court also concluded that Merrill's testimony was not perjurious and that Collier's appellate counsel was not ineffective for failing to pursue this issue during Collier's direct appeal. In the Indiana Court of Appeals, Collier argued that Merrill had an informal agreement or understanding that the State would be lenient in exchange for his testimony against Collier and that the non-disclosure of this informal agreement or understanding violated rights guaranteed by state and federal law. *See Wright v. State,* 690 N.E.2d 1098, 1113-14 (Ind. 1997) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972)). The court of appeals affirmed the decision below and rejected Collier's main argument. *Collier v. State*, 715 N.E. 2d 940 (Ind. Ct. App. 1999).[3] Collier then filed a petition to transfer to the Supreme Court of Indiana, which was denied.

---

[2] Although the precise terms of the dismissal or reduction of Merrill's other charges are no longer available, the State testified at Collier's post-conviction hearings that any dismissals or reduction of sentences in those cases had nothing to do with Merrill's testimony against Collier.

[3] The court of appeals found that Collier's counsel had been ineffective on the firearm possession charge and reversed his conviction for that offense.

With his Indiana remedies exhausted, Collier filed a petition for a writ of habeas corpus in the District Court for the Northern District of Indiana, pursuant to 28 U.S.C. § 2254. The district court, after finding that the Indiana courts' rulings were not contrary to *Giglio* or *Brady*, dismissed the petition and denied a certificate of appealability. Collier requested that we grant him a certificate of appealability on his ineffective counsel and *Brady* claims. We granted the certificate only on the second issue.

## II. ANALYSIS

We review de novo all questions of law arising from a district court's decision to grant or deny an application for writ of habeas corpus. *Todd v. Schomig,* 283 F.3d 842, 848 (7th Cir. 2002). Collier filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996) ("the AEDPA"). Therefore, the AEDPA governs our review of Collier's claims. The record is clear that Collier exhausted his state remedies, *see O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999), and has not procedurally defaulted his *Brady* claim, *see Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001). Under these circumstances, a federal court may grant a writ of habeas corpus only if a petitioner demonstrates that the state court's adjudication of the claim was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir. 2001); 28 U.S.C. § 2254(d)(1).

Collier concedes that the "unreasonable application" analysis does not apply here, so we focus on whether the decision of the Indiana Court of Appeals was contrary to *Brady*. A state court's decision is "contrary to" Supreme Court precedent if: (1) the state court applies a rule that

contradicts the governing law set forth in Supreme Court cases or (2) the state court confronts a set of facts that is materially indistinguishable from a Supreme Court case but arrives at a different result. *Williams,* 529 U.S. at 405. Although Collier's claim on appeal is somewhat murky, a generous reading of his argument reveals a claim pursuant to the "contrary to" reasoning in *Williams*—that the Indiana courts contradicted the governing law of *Brady* by failing to find that (a) he had provided sufficient evidence of Merrill's informal agreement or understanding and (b) this evidence demanded disclosure prior to trial.

According to *Brady,* the prosecution must disclose exculpatory evidence if it is both favorable and material to the defense. 373 U.S. at 87. *Giglio* expanded the *Brady* rule to include impeachment evidence. 405 U.S. at 155. The Court explained in *Giglio* that when the government has entered into an agreement or understanding with a key witness regarding his prosecution, the credibility of the witness is at issue and failure to disclose details of the deal may deny the accused due process. *Id.*

To establish a *Brady* violation Collier must demonstrate that: (1) there was evidence of an agreement or an understanding; (2) the prosecution suppressed the evidence; (3) the evidence was favorable either because it was exculpatory or impeaching; and (4) the evidence was material to the defense. *Brady*, 373 U.S. at 87; *United States v. Young*, 20 F.3d 758, 764 (7th Cir. 1994).

Collier's case turns on the first two prongs of the *Brady* analysis. As to the first prong, Collier and the State dispute whether he has shown evidence of an agreement or understanding and, with regard to the second prong, whether the prosecution suppressed any evidence. As to the third and fourth prongs, the first prosecutor doubted that he could convict Collier without Merrill and Merrill

was the only direct witness to the crime. Therefore, the State cannot seriously dispute that *if* Merrill had an informal agreement *and* it was not disclosed, that evidence would have been impeaching and material to Collier's defense. We therefore consider the evidence (and alleged suppression) of an agreement or understanding, which are the more difficult aspects of Collier's *Brady* claim.

### 1. No evidence of an agreement/understanding

Whether or not an agreement or understanding actually existed is a factual determination. *See Abbott v. United States*, 195 F.3d 946 (7th Cir. 1999). The state courts found that no agreement existed of any kind (informal or otherwise), and we presume that determination to be correct unless Collier can rebut it with clear and convincing evidence to the contrary. *See Mahaffey v. Schomig*, 294 F.3d 907 (7th Cir. 2002); 28 U.S.C. § 2254(e)(1). Both the district court and the Indiana Court of Appeals on post-conviction review agreed with the State's argument and concluded that Collier had not provided sufficient evidence to support the existence of an informal agreement or understanding. During oral argument here, the State and Collier conceded that even though the court of appeals exclusively used the term "agreement," (rather than "understanding") in its opinion, that court should have understood that within the context of this case, the agreement was an informal one—an understanding. Under Collier's reading of *Giglio*, an understanding is created when the government during an interview or interrogation of a witness makes certain statements that contain "an implication that the Government would reward the cooperation of the witness." *See Giglio,* 405 U.S. at 153.

Collier claims that, when viewed cumulatively, this evidence proves that Merrill and the State had an infor-

mal agreement or understanding: (1) Merrill's testimony during the post-conviction hearing; (2) the State's failure to file any charges against Merrill in connection with the McGuire murder; (3) dismissals or favorable treatment of Merrill's other cases; and (4) the first prosecutor's admission that Merrill's testimony was material to Collier's case. Collier says that the state court decisions were contrary to *Brady* because they focused only on an informal "agreement" and failed to explicitly ask whether there was an understanding—as that term is understood in *Giglio*.

The State asserts that only a bilateral understanding of leniency is sufficient to require *Brady* disclosure, regardless of what Merrill may have thought. So, regardless of the precise words that were used, the Indiana courts correctly decided the *Brady* claim, because an "informal agreement" is the same type of understanding that Collier failed to prove was reached in this case. The State also contends that no agreement or promises were made to Merrill in exchange for his testimony and that Collier's evidence does not reflect an agreement or understanding. Indeed, Detective Prater said that Merrill had been promised nothing except that the prosecutor would make the final determination as to whether to file charges based on Merrill's testimony.

After a thorough review of the record, we are convinced that Merrill's evidence does not show a *Brady* violation or evidence of an understanding as interpreted in *Giglio*. Merrill's general and hopeful expectation of leniency is not enough to create an agreement or an understanding. *See United States v. Baskes*, 649 F.2d 471, 477 (7th Cir. 1980) (witness's hopeful expectation that he could avoid criminal proceedings if he testified against the accused did not amount to an undisclosed promise of leniency). Further, unlike *Giglio*, Collier has proffered no evidence of an explicit promise, agreement, or statement made

to Merrill—either by police officers or state's attorneys. We contrast that lack of evidence with the testimony of both Detective Prater and the trial prosecutor, Richard Plath, that there was no agreement with Merrill.[4]

As to Merrill's "understanding," the record is not very clear. At his post-conviction hearing, the Public Defender asked him "[did] anyone involved in Mr. Collier's case promise you or give you anything, like probation on that case, in return for your testimony?" Merrill responded that "[it] is possible. I don't recall. Do you understand what I'm saying? It is possible." Later, on cross-examination by the State, Merrill added "If [the State] did promise me something, like I said, to my knowledge it was either I accept or I testify or either I don't and he would charge me with something or whatever. Something along that nature."

Thus Merrill admits that he was not explicitly told that he would receive leniency based upon his testimony, regardless of its content. This admission is also consistent with the uncontroverted evidence that Merrill attempted to avoid testifying in this case. Because the State was unable to locate Merrill before trial, prosecutors sought and received a continuance. Merrill eventually appeared at the eleventh hour after his arrest on an outstanding probation violation. This behavior, while not proof of his lack of agreement or understanding, certainly does not sound like the actions of one who knew he would escape felony charges simply by taking the stand.

Given our deference to the findings of the Indiana state courts, we cannot conclude that their resolution of

---

[4] At the post-conviction hearing, Plath said "As far as I was concerned, I had no deal with Merrill. . . . My review of the file shows no evidence of any deal and I—Boy, I sure would have put it in writing."

Collier's case was contrary to *Brady* because Collier has not proved that an understanding actually existed. If there was no understanding, there was no impeachment evidence to disclose. In reaching our conclusion, we note that Collier had two full opportunities in state court to offer sufficient proof for his theory. Given these full bites at the apple, we cannot second-guess the decisions of those courts which found that Collier's trial counsel adequately investigated and pursued this theory—and came up short.

### 2. No proof of suppression

Assuming arguendo that Merrill had an implied bilateral understanding of prosecutorial leniency, Collier would still be required under *Brady* to show that the State suppressed evidence of Merrill's special treatment. Here, too, Collier has failed to meet his burden of proof. In order for Collier to establish that the State suppressed evidence, he must demonstrate that: (1) the State failed to disclose known evidence before it was too late for him to make use of the evidence; and (2) the evidence was not otherwise available to him through the exercise of reasonable diligence. *See Boss*, 263 F.3d at 740; *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

Collier cannot meet either prong of the suppression test. Because all of the potential information about Merrill's supposed informal agreement or understanding was available to Collier *before trial*, Collier cannot show that the evidence was not otherwise available. One critical reason why he cannot make this showing is that he could have fully explored this topic in cross-examination of Merrill at trial—but did not do so.

As the record shows, Collier's trial counsel was quite aware of the likelihood that Merrill had something to gain from implicating Collier as the triggerman in McGuire's murder—namely the possibility that Merrill was

the shooter and would deflect blame to Collier instead. Yet all of the questions at trial about Merrill's burglary conviction or alleged understanding came on direct and redirect examination by the prosecution.[5] We cannot fault the State for failing to more fully explore Merrill's alleged understanding when Collier never bothered to seriously inquire about it in the first place.[6] Given these facts, even if a bilateral understanding did exist, Collier did not exercise reasonable diligence in his efforts to discover it.

Because Collier had opportunities to explore Merrill's motives and unearth any statements by authorities to Merrill regarding his potential prosecution, Collier's failure to provide sufficient proof is fatal to his claim. Further, Frederick J. Frosch's admission that the former prosecu-

---

[5] At trial, the prosecution asked Merrill four questions about his recent burglary conviction. On cross-examination, Frosch asked no questions about either Merrill's criminal record or possible deals in this case. On redirect, the State asked: "Did Detective Prater promise that you would not be arrested when you talked to him?" Merrill: "I don't know. He just said—he talked to my mom and everything. I don't know what he said. I don't even remember." State: "Did he say, in fact, that he couldn't make that decision, that it'd be the prosecutor's office that would decide whether or not you'd be charged with anything in connection with this case that you testified to here today?" Merrill: "I don't recall." On re-cross-examination, Frosch again asked no questions of Merrill regarding his burglary conviction or any agreements or understandings to testify against Collier.

[6] During Collier's post-conviction hearing, Collier's attorney asked former counsel Frosch: "Did you ever file any pleadings to request the Court to order the State to disclose any deals made with any witnesses against Mr. Collier?" Frosch: "That would have been part of the standard discovery motion, but at that point in time, I wouldn't have done it and I can't recall if my father [Collier's first attorney] did or not."

tor alerted him to the possibility that there *may have been* a "verbal statement made to [Merrill] that he would not be charged if he was cooperative" demonstrates that disclosure of Merrill's alleged understanding, even if required by *Brady*, was done prior to Collier's trial. Therefore, there was no suppression and no *Brady* violation.

## III.  CONCLUSION

Because Collier has not shown that the decisions of the Indiana state courts are contrary to *Brady*, we AFFIRM the district court's denial of the writ of habeas corpus.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*