Gordon "Randy" STEIDL, Petitioner,

v.

Jonathon R. WALLS, Warden, Respondent.

No. 01–CV–2249.

United States District Court, C.D. Illinois, Urbana Division.

June 17, 2003.

 

Lawrence C. Marshall, Bluhm Legal Clinic, Chicago, IL, Michael Metnick, Metnick; Cherry & Frazier, Springfield, IL, for Plaintiff.

Denise Marie Ambrose, Office of State's Attorney Appellate Prosecutor, Springfield, IL, for Defendant.

## *ORDER*

McCUSKEY, District Judge.

On October 5, 2001, Petitioner, Gordon "Randy" Steidl, filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus (# 2). Petitioner is represented by Jane Raley, Karen Daniel and Lawrence C. Marshall of the Bluhm Legal Clinic of the Northwestern University School of Law. Petitioner is also represented by Michael Metnick of Metnick, Cherry and Frazier in Springfield. In his petition, Petitioner contends that he is entitled to habeas corpus relief because he received ineffective assistance of counsel at his trial. Petitioner has filed a 74–page Memorandum of Law (# 6) in support of his claims of ineffective assistance of counsel and an Appendix (# 5) of various documents.

On January 10, 2002, Respondent, Jonathon R. Walls, filed an Answer (# 13) and numerous Exhibits (# 12). Respondent is represented by Denise M. Ambrose, a Special Assistant Attorney General. On February 6, 2002, Respondent was allowed to file an Amended Answer (# 17). On May 8, 2002, Respondent filed additional exhibits. On February 25, 2002, Petitioner filed a Reply to Respondent's Answer (# 18). Oral argument was heard in this case on August 2, 2002.

This court has carefully reviewed the voluminous exhibits provided by the parties in this case, the lengthy written arguments submitted by both parties and the

transcript of the exceptionally well presented oral argument. Following this careful and thorough review, Petitioner's Petition under 28 U.S.C. § 2254 for a writ of habeas corpus (# 2) is GRANTED.

## FACTS

### I. TRIAL

In June 1987, following a jury trial, Petitioner was found guilty of the murders of Dyke and Karen Rhoads and was sentenced to death. At trial, testimony was presented that, at 4:39 a.m. on July 6, 1986, firemen received a report of a fire at the home of Dyke and Karen Rhoads in Paris, Illinois. Firemen arrived at the scene and, while extinguishing the fire, entered an upstairs bedroom and discovered the bodies of Dyke and Karen Rhoads. Both victims were nude and had suffered multiple stab wounds.

Debra Rienbolt and Darrell Herrington testified that they were present at the Rhoads' house at the time of the murders. Rienbolt testified that she went to the Rhoads' house that night, after midnight, and went in the back door, which was not locked. She stated that she went upstairs and saw Petitioner and his co-defendant, Herbert Whitlock, in a bedroom with Dyke and Karen Rhoads. Rienbolt testified that "there was a broken lamp in the room. Somebody was holding a piece of it." Rienbolt testified that she saw Petitioner and Whitlock stab Dyke Rhoads with a knife she had given to Whitlock. Rienbolt stated that she saw them "both have the knife and stabbing him." Rienbolt testified that she held Karen Rhoads down on the bed, although she could not explain why she did so. Rienbolt stated that Petitioner and Whitlock cut Karen on the throat and "everything got real fuzzy at that point" and she left after that. However, she testified that she remembered the position of the bodies in the room and recalled a fire.

Rienbolt testified that Whitlock returned the knife to her the next day and she cleaned it by soaking it in hot water and "pick[ing] it out." Rienbolt testified that, on February 16, 1987, she came forward to the police voluntarily, gave them the knife and told them "that the knife was the murder weapon." Testimony was presented that a forensic analysis of the knife Rienbolt gave to the police (referred to hereafter as the "Rienbolt knife") showed no traces of human blood or tissue. Only animal hairs were found on the blade. Rienbolt testified that she had pleaded guilty to a felony charge of concealment of homicidal death based upon her "[c]leaning the knife."

Rienbolt testified that she was scheduled to work the evening of July 5, 1986, at the Paris Health Care Center and was paid for working her shift. However, she testified that she did not work that night. She stated that she either had someone else clock her in or clocked herself in and then left. Rienbolt testified that, on July 5, 1986, she had three or four beers, a couple of joints and three or four codeine. She stated that she visited various bars that night and saw Petitioner and Whitlock during the evening. She testified that she saw them leave the Legion Hall around midnight. She testified that an unidentified man, who was not Herrington, was with them at that time. Rienbolt admitted that she is an alcoholic and drug addict and was previously convicted of theft and had two DUI's. Rienbolt testified that she has suffered from blackouts and that it was hard for her to remember some parts of the night of July 5, 1986. Rienbolt further admitted that she initially told police officers different versions of what took place the night of the murders. Rienbolt also testified regarding Whitlock's motive for the murders. She testified that she had observed Whitlock and Dyke Rhoads

arguing about Dyke wanting to get out of the drug business. Rienbolt also stated that Whitlock had referred to Karen Rhoads as his "dream girl" and that Whitlock told her that Karen had slapped him.

Herrington testified that he is an alcoholic and had been drinking since noon on July 5, 1986. He testified that he left the American Legion just before closing time with Petitioner and Whitlock in Petitioner's car. Herrington testified that he had asked Petitioner for a ride home. He stated that Petitioner drove to the Rhoads' house. Herrington testified that Petitioner and Whitlock went inside the house and he stayed in the car and dozed off for a minute or so. He was awakened by the sound of something breaking. He then entered the back door of the house. He testified that the door was locked so he had to use his credit card to wedge the door open. As he entered the house, he heard a female voice screaming. He started up the stairs and saw Petitioner coming down the stairs. Herrington testified that Petitioner had blood on him and had a knife in his hands. Herrington testified that the knife was five or six inches long. Herrington testified that Petitioner took him outside and said "I ought to kill you right now for what you did." Herrington stated that Whitlock came out and left in the car. Herrington testified that Petitioner then took him upstairs and showed him the bodies of Dyke and Karen Rhoads and said "That's what's going to happen to you and your family if there's ever a word said." Herrington stated that he later left and ran for home. He testified that he went to the police and gave them a statement on September 21, 1986. He admitted that he had been convicted of misdemeanor deceptive practices twice and five times for DUI since 1979. Herrington did not testify that he saw Rienbolt at the Rhoads' house the night of the murders.

Likewise, Rienbolt testified that she did not see Herrington at the scene.

Dr. John Murphy, a pathologist, testified that he performed the autopsies of Dyke and Karen Rhoads. Dr. Murphy testified that Dyke Rhoads had 28 stab wounds and Karen Rhoads had 26 stab wounds. Most of the stab wounds on both victims were superficial wounds. One stab wound on Dyke Rhoads was the fatal wound. Dr. Murphy testified that this wound was on his left side under the armpit and extended through his lung into his heart. Karen Rhoads had two stab wounds which could have been fatal. One wound was below her right armpit and one was in her chest. Dr. Murphy stated that these wounds were made with one in-and-out motion. The wounds inflicted below the armpits on both victims were six inches deep. Dr. Murphy testified that the Rienbolt knife was compatible with the wounds suffered by Dyke and Karen Rhoads. Dr. Murphy stated that none of the wounds were inconsistent with the Rienbolt knife. Dr. Murphy testified that he could not determine the time of death but stated that Dyke and Karen Rhoads died before the fire.

Ferlin Wells testified that he was in custody at the Edgar County jail when Petitioner was arrested on February 19, 1987, and brought to the jail. Wells testified that Petitioner said he "supposed" that Dyke and Karen Rhoads were killed because they did not pay for drugs. Wells also testified that Petitioner told him that the house was started on fire to attract attention instead of to destroy evidence. Petitioner also told him that the victims were killed in the bedroom while they were in bed and that the fire was set with gasoline. Wells testified that Petitioner said that, if he had known Herrington was going to come forward, "he would have definitely taken care of him." Wells stated on cross-examination that Petitioner never

actually said that he personally had killed Dyke and Karen Rhoads. Wells also testified that he hoped to get some consideration in his sentencing because of his testimony.

Steve Dosch testified that he was a fireman and responded to the call at the Rhoads' house. He testified that the firemen could not see anything in the house because of the smoke and had to crawl around because of the heat. Dosch stated that he and another fireman reached the upstairs bedroom where the bodies were found after two other firemen had entered the bedroom through a window. The other firemen asked him to get a body bag as he was about to enter the bedroom. When Dosch returned to the bedroom with the body bag, he pushed a broken lamp which was on the floor outside the bedroom door. He testified that the lamp was broken when he moved it.

Petitioner presented an alibi defense. He testified that he had never met or seen Rienbolt before trial. He testified that he knew Herrington, but found him repulsive to be around. He testified he did not see Herrington the night of July 5, 1986, and did not give him a ride home. He stated that, the night of July 5, 1986, he was at the Barn Tavern from 9:30 to 10:30 p.m. He then went to the American Legion and stayed until about 12:15 a.m. on July 6, 1986. He left alone, parked his car at home and walked to the Horseshoe Tavern. He met Christy Farris, Nanette Klein and Dennis Ouzleman there. The four of them went to Ouzleman's apartment, which was in the same building as Petitioner's apartment. Petitioner and Farris went to his apartment around 1:30 a.m. Petitioner testified that he left his apartment around 3:00 a.m. and saw Klein outside. He left for approximately five minutes and mailed his unemployment forms. When he returned, Klein told him

to get Farris because they were going to leave. Petitioner testified that Farris and Klein both left around 3:15 a.m. Petitioner stated that he then went to bed and slept until 11:30 that morning. Petitioner's testimony regarding his whereabouts from 12:30 a.m. to 3:15 a.m. on July 6, 1986, was corroborated by the testimony of Christy Farris and Nanette Klein. In addition, Carol and Beecher Lynch both testified that they saw Petitioner leave the Legion Hall between 12 and 12:30 a.m. on July 6, 1986. Both testified that he was alone when he left in his car. This testimony contradicted Herrington's testimony that he left the Legion Hall with Petitioner and Whitlock that night.

Petitioner also called three witnesses who worked at the Paris Health Care Center, Beverly Johnson, Nancy Davis, and Bonnie Tribbe. Through these witnesses, Petitioner established that the records showed that Rienbolt punched in at 3:45 p.m. on July 5, 1986, and punched out at midnight. Nurse Paula Cooper's log was admitted and showed that Rienbolt's name was on the log as working that evening. However, Johnson, one of Rienbolt's co-workers, testified that it was not uncommon for employees to clock each other in and out. None of the witnesses testified that they observed Rienbolt at work that night. When Davis, the administrator of the Paris Health Care Center, was asked whether she had ever known Nurse Cooper to log in somebody who was not there, an objection to the question was sustained. Nurse Cooper was not called as a witness.

In his opening statement to the jury, the prosecutor stated that Rienbolt would testify that she "voluntarily came forward to the police and provided a knife that was ultimately responsible for the murders." The prosecutor further stated that Rienbolt consistently stated that "this was the knife that was used to commit the crime."

During closing argument, the prosecutor repeatedly referred to "the knife." He stated that Rienbolt came forward and presented a knife "which on 54 wounds is compatible with 54 different wounds, all 54 wounds." He also specifically noted that Rienbolt testified that there was a broken lamp inside the bedroom. He argued that this was "a fact that was known to virtually no one because in fact the lamp was found outside the bedroom."

During his closing argument, Petitioner's trial counsel, S. John Muller, argued that there was not one piece of physical evidence linking Petitioner to the crime scene. Muller argued that Herrington's testimony was not worthy of belief, noting that the police did not even believe Herrington and did not arrest Petitioner until after Rienbolt came forward, five months after Herrington talked to the police. Muller also argued extensively regarding some of the inconsistencies and implausibilities in Rienbolt's testimony. He argued that he could not imagine how anybody would believe anything she said. He noted that Dr. Murphy testified that the fatal wounds were six inches long. He laid the Rienbolt knife on the ledge in front of the jury with a ruler and stated that he "measured this knife blade right up to the handle, and that blade is only five inches long." He then argued that the knife could not be the murder weapon because "I don't think you can make a six-inch stab wound with a five-inch blade." The prosecutor objected to this argument, because Muller was not an expert, and the objection was sustained. Muller later argued that the jury was "[s]upposed to believe you can make a six-inch stab wound with a five-inch blade." An objection to this argument was overruled.

In rebuttal, the prosecutor argued that the jury should consider the consistencies in Rienbolt's statements and said, "[f]rom the very first time she came to the police she said that this is the murder weapon." He then noted that Dr. Murphy testified that the Rienbolt knife was compatible with the fatal wounds. He argued, "[d]efense counsel had the opportunity to ask questions of the experts and present his own expert. Instead he presented himself as an expert." He also argued that "it would be very easy to have one knife as the murder weapon if only one knife was brought." He stated that the "testimony is that there was one knife, and it was used." He argued that what made Rienbolt and Herrington "incredibly believable is the fact that they are materially correct on everything, and not wrong on anything." He again specifically noted that Rienbolt knew there was a broken lamp in the bedroom. He argued that this was a "people case" so it was "even more important to weigh the credibility of the witnesses."

Following the evidence and argument, the jury found Petitioner guilty of two counts of first degree murder. A sentencing hearing was held before the same jury the next day. Muller presented no witnesses on Petitioner's behalf, and the jury found him eligible for the death penalty and also found that there were no mitigating factors sufficient to preclude a sentence of death. Petitioner was then sentenced to death.

## II. PETITION FOR POST-JUDGMENT RELIEF

While Petitioner's direct appeal of his conviction and sentence to the Illinois Supreme Court was pending, he filed a petition for post-judgment relief on February 8, 1989.[1] Petitioner claimed that he was

---

1. The petition was filed pursuant to section 2– 1401 of the Illinois Code of Civil Procedure

entitled to relief from the judgment of conviction because the two main prosecution witnesses against him, Rienbolt and Herrington, had both recanted their trial testimony. He also claimed that two prisoners had signed affidavits which stated that Wells told them that he lied at trial. A four-day evidentiary hearing was held regarding the petition. The evidence at the hearing showed that Rienbolt signed two affidavits which contradicted her trial testimony. One affidavit stated that Petitioner was not involved in the murders. In addition, Herrington provided a court-reported statement in which he stated that he never saw Petitioner with a knife. Several witnesses also testified that Rienbolt and Herrington made statements following the trial which were inconsistent with their trial testimony. Charles Phillips and Tracy Parker testified that they were in the same cell block with Wells. They both testified that Wells told them that Petitioner had not talked to him and he had lied at Petitioner's trial in exchange for a lesser sentence on a pending charge against him. However, at the hearing, Rienbolt, Herrington and Wells all testified that their trial testimony had been truthful. The trial court denied the petition for post-judgment relief on March 20, 1990, in a three-page opinion. The trial court found that Petitioner failed to establish by clear and convincing evidence that the trial testimony of Rienbolt, Herrington or Wells was false and willfully and purposely given. On January 24, 1991, the Illinois Supreme Court affirmed Petitioner's conviction and death sentence and affirmed the denial of his petition for post-judgment relief. *People v. Steidl*, 142 Ill.2d 204, 154 Ill.Dec. 616, 568 N.E.2d 837 (1991).

(then Ill.Rev.Stat. ch. 110, § 2–1401 (1987), now 735 Ill. Comp. Stat. 5/2–1401 (West

### III. POST–CONVICTION PETITION

On April 3, 1992, Petitioner filed a petition for post-conviction relief pursuant to the Illinois Post–Conviction Hearing Act, 725 Ill. Comp. Stat. 5/122–1 *et seq.* (West 1990). On June 22, 1995, Petitioner filed a superseding amended petition. In his petition, Petitioner argued, among other things, that Muller rendered ineffective assistance of counsel at trial because: (1) Muller missed a vital opportunity to discredit Rienbolt's testimony that the knife she supplied was used in the murders; (2) Muller's failure to obtain an expert examination of the lamp, which would have shown that the lamp was broken after the fire rather than before, deprived Petitioner of an opportunity to cast doubt on Rienbolt's testimony; (3) Muller did not call Rienbolt's supervisor as a witness to verify that Rienbolt was present at work on July 5, 1986, contrary to Rienbolt's testimony; and (4) Muller failed to prepare and present sufficient mitigation evidence or witnesses at the sentencing hearing.

On October 25, 1995, the trial court denied the post-conviction petition without an evidentiary hearing. Petitioner appealed to the Illinois Supreme Court. The Court reversed, and remanded the case for an evidentiary hearing before a newly substituted judge. *People v. Steidl*, 177 Ill.2d 239, 226 Ill.Dec. 592, 685 N.E.2d 1335, 1347 (1997). The Court noted that Petitioner's post-conviction petition identified several instances where Muller's failure to investigate precluded the jury from hearing evidence. *Steidl*, 226 Ill.Dec. 592, 685 N.E.2d at 1343. The Court specifically stated the "evidence in this case was closely balanced" and "[n]o physical evidence linked [Petitioner] to the crime scene and [Petitioner] presented an alibi." *Steidl*,

2000)).

226 Ill.Dec. 592, 685 N.E.2d at 1343. The Court concluded that "[g]iven the balance of the evidence in this case, [Petitioner's] post-conviction petition arguments combine to make a substantial showing that his constitutional rights were violated for purposes of requiring an evidentiary hearing on [Petitioner's] post-conviction petition." *Steidl,* 226 Ill.Dec. 592, 685 N.E.2d at 1343. In addition, the Court stated that Muller's "failure to conduct even a minimal investigation into possible mitigation evidence raises serious questions as to the effectiveness of his legal representation of [Petitioner]." *Steidl,* 226 Ill.Dec. 592, 685 N.E.2d at 1344. The Court also noted that Rienbolt had again recanted her trial testimony, this time in a four-hour videotaped statement. The Court stated:

> Because there was no physical evidence linking [Petitioner] to the crime scene, and further given that the evidence against [Petitioner] was comprised solely of witness testimony, we believe that this specific situation warrants a review of Rienbolt's new recantation at an evidentiary hearing.

*Steidl,* 226 Ill.Dec. 592, 685 N.E.2d at 1345.

A nine-day evidentiary hearing was held on various days during the months of July through October 1998 before Circuit Judge Tracy W. Resch. Paula Brklach testified that her name was Paula Cooper in 1986. She testified that she is a licensed practical nurse and has been employed at the Paris Health Care Center since 1984. In July 1986 she worked the 4:00 p.m. to midnight shift and supervised nursing assistants during this shift. Brklach stated that she would have numerous contacts with the nursing assistants she supervised during the course of the shift. Brklach testified that she was required, as part of her responsibilities, to keep a nursing log. Brklach identified her nursing log for the evening shift on July 5, 1986. Brklach testified that she did not have any specific recollection as to any activities on that day. However, she stated that her log, which was written in her handwriting, showed that Rienbolt worked with her that evening and was responsible for sections A and B of the south side wing. Brklach testified that she would have written Rienbolt's name on the log towards the end of the shift, around 10:00 or 11:00. She stated that she would not have written Rienbolt's name on the nursing log if she was not there that day. Brklach stated that she wrote Rienbolt's name on the nursing log because Rienbolt "was there working that evening." Brklach testified that she would have noted it on her log if Rienbolt did not work on that date. Brklach testified that Muller did not talk to her prior to Petitioner's trial and that she would have been available to testify.

Dr. Murphy testified that he is board certified as a pathologist, not a forensic pathologist. He stated that another physician in his office handled most of the autopsies which involved deaths by stabbing. He stated that he had handled approximately 20 to 25 such cases. Dr. Murphy testified that he measured the depth of the fatal stab wound on Dyke Rhoads to be six inches. The length of the wound where it entered the skin was 2.5 centimeters (cm).[2] Dr. Murphy also testified that a wound in Dyke Rhoads' sternum was 2 cm. in length. Dr. Murphy stated that one of the fatal wounds on Karen Rhoads was 6 3/8 inches deep and 2.5 cm. in length. The other fatal wound was almost 6 inches deep and measured 2.5 cm. in length.[3] Dr.

---

**2.** The testimony at the hearing showed that the linear mark on the surface of the skin caused by a stab wound is referred to as the "length" of the wound.

**3.** The transcript from the hearing states that

Murphy testified that a 6–inch deep wound can be caused by a knife with a 5–inch blade because of the compressibility of the human body. Dr. Murphy also stated that it was not possible to precisely measure the depth of a wound. Dr. Murphy testified that the blade of the Rienbolt knife measured 5 inches long. Dr. Murphy testified that the Rienbolt knife had a feature called a ricasso against the handle. The ricasso was a thicker portion of the blade that was squared off and was in contact with the handle itself and supplied support between the handle ·and the actual cutting part of the knife. Dr. Murphy stated that, if the ricasso went into the wound, the wound itself would be square at each end. Dr. Murphy testified that there was no squared off portion on the wounds on either Dyke or Karen Rhoads.

Dr. Murphy stated that the Rienbolt knife also had a hilt, which was a transverse portion that separated the handle from the blade. Dr. Murphy testified that he did not see any hilt marks or bruising around the wounds on either victim. Dr. Murphy stated some force would be necessary for a 5–inch blade to make a 6–inch wound. He testified that it is possible that the Rienbolt knife would leave hilt marks or some type of bruise or abrasion. Dr. Murphy was shown a knife which was found in the kitchen sink at the Rhoads' house after the murders (referred to hereafter as the "kitchen sink knife"). Dr. Murphy testified that the kitchen sink knife was 8 inches long. Dr. Murphy also stated that the blade on this knife was 2 cm. wide at 2 inches. This was consistent with the wound which went through Dyke Rhoads' sternum, which was 2 inches deep. At 2 inches, the Rienbolt knife was only 1 cm. wide. Dr. Murphy testified that the kitchen sink knife could have caused the

wounds on Dyke and Karen Rhoads. However, Dr. Murphy also testified that it remained his opinion that the Rienbolt knife was compatible with the wounds suffered by Dyke and Karen Rhoads. Dr. Murphy clarified that all stab wounds are a combination of cutting and stabbing so that the length of the wound is not necessarily indicative of the blade that caused the injury.

Dr. Michael Baden testified that he has been a physician since 1959 and is certified as a forensic pathologist. He testified that he has performed more than 20,000 autopsies and has been employed by the New York State Police as a forensic pathologist since 1985. Dr. Baden stated that he had done autopsies in more than a thousand stabbing deaths. Dr. Baden testified that he reviewed police reports, crime scene photographs, the autopsy records in this case, and some of the trial testimony. He also examined the Rienbolt knife and the kitchen sink knife. In addition, he spoke to Dr. Murphy and examined Dyke Rhoads' sternum, which he received from Dr. Murphy. Dr. Baden stated that the sternum, which had a stab wound, was of particular value because "the bone tends to preserve its shape or will preserve the shape of the weapon going through it in a more complete fashion." Dr. Baden testified that the blade of the Rienbolt knife was 5 inches long and 1.3 cm. wide. Dr. Baden testified that the Rienbolt knife was a folding knife which had a locking device and objects that protruded at the bottom of the handle. Dr. Baden testified that the blade of the kitchen sink knife was 8 inches long and 2.4 cm. wide.

Dr. Baden discussed the wounds found on Dyke and Karen Rhoads, including the fatal wounds which were approximately 6 inches deep. Dr. Baden agreed that a 5–

Dr. Murphy testified that the wound was 2.35 cm. in length. However, there is no dispute

that his records showed that the wound was 2.5 cm. in length.

inch knife can cause a 6–inch wound. However, Dr. Baden testified that, in his opinion, it was significant that there were no hilt marks, abrasion marks or impact marks on the skin next to the fatal stab wounds. Dr. Baden stated that, to a reasonable degree of medical certainty, he would expect there to be marks from the hilt next to the wound if the Rienbolt knife caused the fatal stab wounds. Dr. Baden stated that, if a 5–inch blade causes a 6–inch wound, there has to be contact between the hilt and the skin. He explained that the stab wound would have to be "inflicted with sufficient force to go all the way down to the hilt and ... that would have caused some bruising or injury or scuffing of the skin beneath it."

Dr. Baden also found it significant that the length of the fatal wounds was about twice the width of the blade on the Rienbolt knife. Dr. Baden testified that it was his opinion to a reasonable degree of medical certainty that the Rienbolt knife was not the knife that caused the fatal injuries to Dyke and Karen Rhoads. Dr. Baden stated that this opinion was based upon the width of the blade as well as the lack of impact hilt abrasion. Dr. Baden testified that the Rienbolt knife was too narrow to cause the wounds. Dr. Baden stated that his examination of the sternum supported his conclusion because the stab wound in the sternum did not match the Rienbolt knife. Dr. Baden stated that most of the wounds in both bodies were more than 1.3 cm. in length. Dr. Baden stated that "it would be extremely unlikely in my experience that a smaller blade would keep giving the same measurements of up to 2.5 centimeters" as present in the 54 wounds. Dr. Baden testified that the wounds were "not at all in my opinion consistent with the Rienbolt knife." Dr. Baden testified that he saw no indicators in the fatal wounds which would show that the knife was moved enough to double the length of the wound in the skin. Dr. Baden specifically stated that the two fatal wounds on Karen Rhoads "were not inflicted" by the Rienbolt knife. Dr. Baden testified that the Rienbolt knife could have caused some of the wounds but could not have caused all of the 54 wounds suffered by Dyke and Karen Rhoads. He stated that the kitchen sink knife was entirely consistent with all of the wounds in both bodies.

Dr. Larry Blum testified that he is a medical doctor. He specializes in forensic pathology and is board certified in that field. Dr. Blum testified that he has performed 150–200 autopsies which involved stabbing wounds. Dr. Blum testified that stabbing wounds can be elongated because of cutting action which occurs frequently in homicidal stab wounds. Dr. Blum testified that this results in a wound which has a length greater than the width of the knife blade. In Dr. Blum's opinion, one cannot determine the width of the blade by examining the length of the wound. Dr. Blum testified that, in his opinion, the Rienbolt knife was compatible with all of the stab wounds inflicted on Dyke and Karen Rhoads. Dr. Blum examined the hilt on the Rienbolt knife and testified that one may or may not see hilt marks depending on the amount of force used, whether the individual's hand was covering the hilt when the wound was made, whether or not there was clothing or other material present between the skin and the knife, and the nature of the hilt itself. Dr. Blum also stated that the heat from the fire may have altered the appearance of the skin around the wounds. Dr. Blum testified that he would not rule out the Rienbolt knife as the knife which caused the Rhoads' injuries because the bodies lacked any particular type of hilt marks. Dr. Blum also testified that the kitchen sink

knife could have made the wounds on the Rhoads' bodies.

On cross-examination by defense counsel, Dr. Blum stated that, typically, when a knife with a ricasso is used, you could see one end of the wound squared off and one end pointed. Dr. Blum testified that a hilt on a knife could very well leave a mark. Dr. Blum acknowledged that, if the person doing the stabbing used fingers to cover the hilt, it was foreseeable that bruises could be left from the hand. Dr. Blum also acknowledged that there was no evidence that the victims were wearing clothing when they were stabbed. Dr. Blum further stated that "cutting or moving back and forth" is much less likely in the sternum. Dr. Blum admitted that the measurement of the wound in Dyke Rhoads' sternum matched the kitchen sink knife and did not match up with the exact measurements of the Rienbolt knife. On redirect examination, Dr. Blum stated that, if a wound gapes open, you would not necessarily see ricasso marks. He stated that it was his opinion, within a reasonable degree of medical certainty, that the Rienbolt knife could have been the knife which inflicted all of the wounds found on the Rhoads' bodies.

Muller, Petitioner's trial counsel, testified at the hearing that he believed it was important to discredit Rienbolt's testimony at trial. He testified that part of his trial strategy was to attempt to show that the Rienbolt knife could not have been the murder weapon. He stated that it was his belief that it was impossible for a knife with a 5–inch blade to make a wound 6 inches in depth. Muller stated that he did not read any books on stab wounds or consult an expert regarding stab wounds. Muller testified that his trial strategy on the knife was to "lay in the weeds" and that he "strategically chose to wait until closing" to present information about the

length of the blade and the depth of the wounds. Muller stated that he remembered seeing a photograph of a knife in the kitchen sink at the Rhoads' house, but did not remember if he examined the knife. He did not have the kitchen sink knife examined or forensically tested by experts. Muller also testified that he did not remember much about the lamp and did not utilize a crime scene investigator or a fire examiner. Muller testified that he did not recall whether he interviewed Brklach.

Donald Tankersley testified that he is a special agent in the arson division of the Illinois office of the State Fire Marshal. Tankersley stated that he investigated the fire at the Rhoads' house. In fact, Tankersley had testified at Petitioner's trial that the fire at the Rhoads' house was deliberately set, with points of origin in the kitchen and the bedroom. Following questioning about his experience, Tankersley was qualified by the court as an expert in soot patterns. Tankersley testified that, based upon his review of photographs, there was no soot deposit on the interior of the lamp found outside the Rhoads' bedroom which "means that portion there had been broken after the time of the fire."

Terry Lynn Brown testified that he was a Fire Captain with the City of Decatur Fire Department. He is a certified fire investigator and arson investigator and investigates fires for insurance companies. Brown testified that he reviewed photographs taken in the bedroom at the Rhoads' house after the fire. He testified that the outline of a lamp could be seen from the soot patterns on the photographs. He stated that he could see that the base of the lamp was fully against the floor, protecting that area. Based upon his review of the photographs, Brown stated that the "lamp appears to have been intact at the time of the fire." Brown also stated that the photographs showed that "the

white ceramic on the inside of the lamp shows no evidence of any smoke staining that would have been present if the lamp had been broken prior to the fire." Brown specifically stated that the "lack of any soot on the inside [of the lamp] tells you that the lamp was not broken." Brown stated that, after a fire is extinguished, no further soot staining develops. Brown testified that he also examined the lamp itself. He stated that the lamp was white on the inside and had relatively no soot staining on the inside which was an indication to him that the lamp was broken after the fire. Brown testified that his opinion, to a reasonable degree of scientific certainty, "was that the lamp was not broken at the time of the fire." Brown stated that, if a piece of the lamp had been removed prior to the start of the fire, he would expect to see soot deposits on the interior portion of the lamp as well as protected areas on the floor where pieces of the lamp were laying. Brown unequivocally testified that the lamp was completely intact during the fire.

The videotape of a deposition Rienbolt gave on February 17 and 18, 1996, was played during the hearing. A transcript of the deposition was part of the record from the hearing. Rienbolt testified during her deposition that she did work the night of July 5, 1986, but left work 30–45 minutes early. She testified that she was not at the Rhoads' house the night they were killed. Rienbolt stated that a police officer told her that he knew she was involved. She was nervous and gave police officers the knife, thinking that they would figure out she wasn't involved. She testified that, to her knowledge, the Rienbolt knife was not used to kill Dyke and Karen Rhoads. Rienbolt said that she had no knowledge of Petitioner being involved in the crime. She stated that she just went along with the police officers in giving her statements implicating Petitioner and

Whitlock. She specifically stated that police officers brought up the broken lamp.

At the hearing, Rienbolt was called as a witness and testified that she lied during the videotaped deposition and "just ... wasn't thinking" when she gave her deposition in which she recanted her trial testimony. She testified that everything she said at trial was true.

After all of the evidence was presented, the State argued that the lamp may have been broken after the fire. The State noted that "[t]his was a tumultuous fire scene, and I expect that a lot of things were broken in the house during the course of the firemen coming in and putting out the fire." The State argued that it was the presence of a lamp that corroborated Rienbolt's testimony, even if she was mistaken about the lamp being broken.

Following the hearing, Judge Resch entered an opinion and order on December 11, 1998. Judge Resch denied Petitioner's request for a new trial, but found that Muller had provided ineffective assistance of counsel at sentencing and granted Petitioner a new sentencing hearing. On February 18,1999, Petitioner was resentenced to a term of life imprisonment after the state declined to pursue the death penalty. On May 3, 1999, the Illinois Supreme Court transferred Petitioner's appeal of Judge Resch's ruling to the Appellate Court, Fourth District, because Petitioner was no longer sentenced to death.

On December 5, 2000, the Appellate Court affirmed the judgment of the circuit court of Edgar County. *People v. Steidl,* No. 4–99–0351, 317 Ill.App.3d 1173, 270 Ill.Dec. 670, 783 N.E.2d 245 (2000) (unpublished order). The court found that Petitioner was not prejudiced by Muller's failure to submit the kitchen sink knife to forensic testing. *Steidl,* No. 4–99–0351, slip op. at 6, 783 N.E.2d 245. The court further found that Petitioner had "failed to

establish both that defense trial counsel's performance was deficient and that he was prejudiced by the failure of Muller to seek forensic investigation of whether the ceramic portion of the lamp was in fact broken prior to the fire being started." *Steidl,* No. 4–99–0351, slip op. at 8, 783 N.E.2d 245. The court also found that Petitioner had "not demonstrated that the result of the trial would have been different had Brklach testified." *Steidl,* No. 4–99–0351, slip op. at 10, 783 N.E.2d 245. The court finally found that "[a]ny arguable deficiencies in defense trial counsel's performance were not cumulatively so prejudicial to [Petitioner] to indicate that the outcome of the trial would have been different had the alleged deficiencies of counsel not occurred." *Steidl,* No. 4–99–0351, slip op. at 14, 783 N.E.2d 245.

Petitioner filed a petition for leave to appeal to the Illinois Supreme Court. On April 4, 2001, the Court denied Petitioner's petition for leave to appeal. On October 5, 2001, Petitioner filed his petition under 28 U.S.C. § 2254 for a writ of habeas corpus (# 2).

## ANALYSIS

Because Petitioner filed his habeas petition after April 24, 1996, the petition is reviewed pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Rodriguez v. Scillia,* 193 F.3d 913, 916 (7th Cir.1999). Under the AEDPA, a state prisoner who files for a writ of habeas corpus must establish that the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. *Brown v. Sternes,* 304 F.3d 677, 690 (7th Cir.2002), *quoting* 28 U.S.C. § 2254(d). In reviewing Petitioner's habeas petition, this court must examine the decision of the last state court to rule on the merits of the issue. *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir.2002).

Section 2254(d) sets out a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002), *quoting Lindh v. Murphy,* 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). However, "deference does not imply abandonment or abdication of judicial review" and "does not by definition preclude relief." *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003). " 'A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case' qualifies as a decision involving an unreasonable application of clearly established federal law." *Boss v. Pierce,* 263 F.3d 734, 739 (7th Cir.2001), *cert denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002), *quoting Williams v. Taylor,* 529 U.S. 362, 407–08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Reasonableness is judged objectively, not subjectively. *Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *Boss,* 263 F.3d at 739. "Therefore, a federal court may not grant habeas corpus relief simply because it has independently concluded that the relevant state court decision misapplies clearly established federal law. The decision's application of Supreme Court precedent must be so erroneous as to be unreasonable." *Boss,* 263 F.3d at 739.

Here, Petitioner claims that he was denied the effective assistance of trial counsel. In *Strickland v. Washington,* 466

U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); the United States Supreme Court stated that the benchmark for judging a claim of ineffective assistance of counsel is whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." A claim of ineffective assistance of counsel requires a showing that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052; *Washington v. Smith*, 219 F.3d 620, 627 (7th Cir.2000). To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Woodford*, 123 S.Ct. at 359, *quoting Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In determining whether there is a reasonable probability that the result of the proceeding would have been different, the courts must consider "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Where the evidence presented at trial was closely balanced, it is more likely that an attorney's deficient performance was prejudicial. *See Strickland*, 466 U.S. at 696, 104 S.Ct. 2052 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"); *cf. Ouska v. Cahill–Masching*, 246 F.3d 1036, 1050–51 (7th Cir.2001) (no prejudice demonstrated from trial counsel's errors where significant physical evidence linked the defendant to the crime scene and the murder). The rule set forth in *Strickland* is "clearly established Federal law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495; *Washington*, 219 F.3d at 627.

■ The ultimate question this court must answer in this case is whether the appellate court's ruling—that Muller's representation of Petitioner at trial was not ineffective under *Strickland*—"was contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court." *See Boss*, 263 F.3d at 741, *quoting* 28 U.S.C. § 2254(d)(1). In answering this question, this court must consider whether the decision is "at least minimally consistent with the facts and circumstances of the case" or "if it is one of several equally plausible outcomes." *Boss*, 263 F.3d at 742, *quoting Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997), and *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir.1997). However, this court should grant the writ of habeas corpus if the appellate court's determination is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary" as to be unreasonable. *Boss*, 263 F.3d at 742, *quoting Hall*, 106 F.3d at 749. "[C]areful review of the evidence and the reasons supporting the decision is required in determining the reasonableness of a state court decision." *Boss*, 263 F.3d at 742.

Petitioner argues that Muller rendered ineffective assistance of counsel at trial because he failed to discredit the prosecution's alleged accomplice witness, Rienbolt, with readily available forensic and testimonial evidence. Specifically, Petitioner claims that Muller was ineffective because he: (1) failed to present Brklach as a witness; (2) failed to present expert testimony that the Rienbolt knife was not the murder weapon; and (3) failed to investigate and present forensic evidence to contradict Rienbolt's testimony that a lamp in

the Rhoads' bedroom was broken at the time of the murders. In addition, Petitioner argues that the cumulative effect of these errors by Muller warrants the grant of a writ of habeas corpus.

## I. BRKLACH'S TESTIMONY

■ Petitioner argues that Muller's failure to interview and call Brklach as a witness constituted ineffective assistance of counsel. Brklach was Rienbolt's direct supervisor and signed a nursing log which showed that Rienbolt was at work on July 5, 1986. Muller easily could have located Brklach because he had the nursing log which was signed by Brklach.[4] Petitioner argues that Brklach's testimony would have been extremely helpful because she would have testified that Rienbolt was at work during the time she claimed to have witnessed the acts leading up to the murders. At the evidentiary hearing, Brklach testified that she had no independent recollection of July 5, 1986. However, she testified that, if Rienbolt had not been working that night, she would not have written her name on the log. Brklach stated that she made her log entries near the end of the shift. Brklach stated that she wrote Rienbolt's name on the nursing log because Rienbolt "was there working that evening." Brklach testified that she would have noted it on her log if Rienbolt did not work on that date.

At trial, Muller called Nancy Davis, the administrator of the Paris Health Care Center, Beverly Johnson, one of Rienbolt's co-workers, and Bonnie Tribbe, another supervisor who was working on July 5, 1986. Davis was able to identify the time card and nursing log which showed that Rienbolt was at work on July 5, 1986. Tribbe, who was supervising a different area, also identified Brklach's signature on the nursing log. However, when Davis

was asked whether she had ever known Nurse Cooper to log in somebody who was not there, an objection to the question was sustained. Johnson testified that she did not work on July 5, 1986, and did not punch Rienbolt in. This contradicted one of Rienbolt's statements, in which she said that Johnson had punched her in that night. However, Johnson testified that it was not uncommon for employees to clock each other in and out.

Following the evidentiary hearing, Judge Resch specifically found that Brklach was a credible witness. However, he also found that her testimony was cumulative. The appellate court agreed that Brklach's testimony was cumulative. The appellate court stated that "Davis, an administrator, could testify to the routine practices of the institution, as could Brklach." *Steidl,* No. 4–99–0351, slip op. at 10, 783 N.E.2d 245. This conclusion is not supported by the record, however, because Davis was not allowed to testify regarding whether Brklach would log someone in who was not there. Only Brklach could have presented such testimony. The court then found that "Muller's failure to interview Brklach and call her as a witness was a matter of trial strategy, which does not form the basis of ineffective assistance of counsel." *Steidl,* No. 4–99–0351, slip op. at 10, 783 N.E.2d 245. This court concludes that this statement has no factual support in the record. In fact, the evidence presented by Petitioner overcame the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *See Washington,* 219 F.3d at 627, *citing Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Muller testified that he did not recall whether he interviewed Brklach and spe-

---

4. As noted previously, at the time of the mur- ders, Brklach's name was Paula Cooper.

cifically stated that there was no reason he could think of not to interview persons at the Paris Health Care Center. Muller testified that he did not recall whether he was "able to make any independent assessment as to the value of the testimony of Paula [Brklach]." This court concludes, based upon a careful review of the record, that Muller's failure to contact and interview Brklach cannot be considered "trial strategy" and must instead be considered representation which fell below an objective standard of reasonableness. The record shows that Muller subpoenaed Tribbe during the course of the trial and, apparently, mistakenly and in haste subpoenaed the wrong supervisor. Tribbe added nothing to the defense other than an additional identification of Brklach's signature on the nursing log. It would not have been difficult for Muller to contact Brklach, and Brklach would have testified that her nursing log showed Rienbolt was physically present at work during her shift on July 5, 1986. Brklach would have stated that she wrote Rienbolt's name on the nursing log because Rienbolt "was there working that evening." Thus, the jury would have heard testimony that Rienbolt was physically present at work the evening of July 5, 1986, and was not at the various taverns and bars where she claimed to have been and where she claimed to have had various contacts with Petitioner and Whitlock, including discussions with Whitlock about the knife. No one Muller called at trial was able to present this kind of testimony.

Respondent argues at length that the appellate court's decision was correct based upon the fact that Brklach testified that, in 1998, she had no specific recollection of the activities on July 5, 1986, and that she had no specific recollection of Rienbolt being at work that evening. However, Brklach testified that she knew that Rienbolt was at work that evening because she did not write anyone's name on the nursing log who was not there working.

The appellate court finally concluded that Petitioner had "not demonstrated that the result of the trial would have been different had Brklach testified." *Steidl,* No. 4–99–0351, slip op. at 10, 783 N.E.2d 245. This court first notes that, although the appellate court recited the correct standard at the beginning of its order, it applied the wrong standard to this claim. Petitioner did not need to show that the result of the trial "would have been different" but rather that there was a "reasonable probability" that the result of the trial would have been different. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495; *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *cf. Woodford,* 123 S.Ct. at 359–60 (where state court set forth "reasonable probability" standard of *Strickland* on several occasions, use of term "probable" in four places without the modifier "reasonably" did not show that the state court applied the wrong standard under *Strickland*).

This court also concludes that a careful review of the record shows that Brklach's testimony clearly could have led the jury to conclude that Rienbolt was lying about her activities the night of the murders and that her claim to have been an eyewitness to the murders was not worthy of belief. In this closely balanced case, where a corroborated alibi defense was presented, there is a "reasonable probability" that the result of the trial would have been different if Brklach's readily available testimony had been presented. This court concludes that there is a probability sufficient to undermine confidence in the outcome.

For all of the reasons stated, this court must conclude that the appellate court's conclusion that Muller's failure to investigate and call Brklach as a witness was not ineffective assistance of counsel was an

unreasonable application of *Strickland.* In making this determination, this court is fully aware that an unreasonable application of federal law is different from an incorrect application of federal law. *See Woodford,* 123 S.Ct. at 360. This court also recognizes that it is Petitioner's burden to show that the state court applied *Strickland* to the facts in an objectively unreasonable manner and that this court cannot merely substitute its own judgment for that of the state court. *See Woodford,* 123 S.Ct. at 360. This court concludes that Petitioner has met his burden and specifically concludes that the appellate court's ruling was an objectively unreasonable, not just an incorrect, application of *Strickland.*

## II. TESTIMONY REGARDING KNIFE

■ Petitioner next argues that Muller was ineffective for failing to present forensic evidence that the Rienbolt knife was not the murder weapon. Petitioner notes that Rienbolt's account of the murders revolved in large part around the knife that she claimed she gave to Whitlock and that she claimed was used to commit the murders. The prosecutor repeatedly argued to the jury that Rienbolt should be believed because she gave the murder weapon to the police. According to Petitioner, testimony that the Rienbolt knife was incompatible with the Rhoads' wounds would have had a devastating impact on Rienbolt's credibility. Petitioner contends that,

even though Muller testified at the evidentiary hearing that it was his trial strategy to discredit Rienbolt's testimony and show that the Rienbolt knife could not have been the murder weapon, he did not take any steps to present evidence that would either (1) establish that the Rienbolt knife could not have been the murder weapon, or (2) at least create significant doubt regarding whether the Rienbolt knife was the murder weapon. In fact, during his cross-examination of Dr. Murphy at trial, Muller did nothing more than reinforce Dr. Murphy's opinion that the Rienbolt knife was compatible and consistent with the fatal wounds. Petitioner asserts that Muller's failure to investigate this matter and present competent evidence on the subject constituted ineffective assistance of counsel. Petitioner argues that "[n]o marginally competent lawyer defending a capital case in which forensic evidence regarding knife wounds was critical would have 'winged it' by doing no reading, speaking with no experts, conducting no meaningful cross-examination, and presenting no evidence to challenge the prosecution's assertions that this forensic evidence constituted strong evidence of [Petitioner's] guilt." Petitioner notes that the failure to conduct an adequate investigation and present available evidence favorable to the defense constitutes ineffective assistance of counsel. *See Williams,* 529 U.S. at 395–96, 120 S.Ct. 1495; *Miller v. Anderson,* 255 F.3d 455, 459 (7th Cir.2001); *Washington,* 219 F.3d at 630–31.[5]

---

**5.** This court notes that it agrees with Petitioner that Muller's performance in regard to the knife fell below an objective standard of reasonableness. In fact, Rienbolt's testimony was the only evidence connecting the knife to the murders as testing of the knife failed to provide any evidence which indicated it was used in the murders. Under these circumstances, it was irresponsible for defense counsel not to consult experts. *See Miller,* 255 F.3d at 459. Muller, however, did not investi-

gate and did not introduce competent evidence at trial to challenge Rienbolt's testimony that the knife she gave to the police was the murder weapon. At trial, Dr. Murphy's opinion that the Rienbolt knife was consistent with the Rhoads' injuries went completely unchallenged. Muller presented no evidence to support his theory that the Rienbolt knife was not the murder weapon and, instead, made only a misguided and unsuccessful attempt to challenge Dr. Murphy's testimony

The appellate court did not decide the issue of whether Muller' performance in this regard fell below an objective standard of reasonableness. Instead, the appellate court concluded that Petitioner failed to establish any prejudice resulting from the allegedly deficient performance of counsel. *Steidl,* No. 4–99–0351, slip op. at 6, 783 N.E.2d 245. The court stated that "Baden did not testify that the Rienbolt knife could not have caused the fatal wounds or that the kitchen sink knife was more likely to have caused the 51 nonfatal wounds, and he acknowledged that the fatal wounds could be caused by either knife." *Steidl,* No. 4–99–0351, slip op. at 5, 783 N.E.2d 245. The appellate court further stated that "[a]ll of the pathologists agreed that a knife blade can create a skin cut length in excess of the width of the blade and the Rienbolt knife could have caused each of the fatal wounds." *Steidl,* No. 4–99–0351, slip op. at 6, 783 N.E.2d 245. This court must agree with Petitioner that the appellate court's statements evidence a profoundly mistaken reading of the record.

Dr. Baden clearly testified that, to a reasonable degree of medical certainty, the Rienbolt knife did not cause the fatal wounds on Dyke and Karen Rhoads. He also explained this conclusion at length, carefully discussing the significance of the lack of any hilt or abrasion marks on the skin and the significance of how much the length of the wounds exceeded the width of the blade on the Rienbolt knife. In addition, the testimony of Dr. Murphy and Dr. Blum was consistent with Dr. Baden's testimony on some points. Dr. Murphy and Dr. Blum testified that it was possible that a knife like the Rienbolt knife would leave hilt marks. Also, while Dr. Blum testified that hilt marks would not have been left if the individual doing the stabbing had his hand over the hilt or if clothing or other material was between the hilt and the skin, he conceded that a hand over the hilt may well have left a bruise on the skin and that there was no evidence that the Rhoads were clothed at the time they were stabbed with a knife. Dr. Blum also testified that the Rienbolt knife did not match up with the wound on Dyke Rhoads' sternum. Moreover, both Dr. Murphy and Dr. Blum testified that, typically, a knife with a ricasso, such as the Rienbolt knife, would leave a distinctive "squared off" mark on the wound, a mark not present on the fatal wounds on Dyke and Karen Rhoads. Therefore, the testimony presented at the hearing showed that there were significant reasons to doubt whether the Rienbolt knife was actually the murder weapon. The appellate court's statements that Dr. "Baden did not testify that the Rienbolt knife could not have caused the fatal wounds" and that "[a]ll of the pathologists agreed ... the Rienbolt knife could have caused each of the fatal wounds"

during closing argument. Because of Muller's complete failure to conduct any kind of investigation or present any evidence which called into question whether the Rienbolt knife could have been the murder weapon, the jury was left with the inaccurate impression that there was nothing inconsistent with the Rienbolt knife and the fatal wounds. *See Washington,* 219 F.3d at 633 (testimony would have undercut impact of physical evidence). This court concludes that Petitioner has shown that Muller's performance in this regard fell below an objective standard of reasonableness. *See Washington,* 219 F.3d at 631–32. This court further notes that Muller's testimony that it was his "strategy" to "lay in the weeds" and make this argument at closing does not immunize his decision from review in a challenge to his effectiveness. *See Miller,* 255 F.3d at 458. "Tactics are the essence of the conduct of litigation; much scope must be allowed to counsel, but if no reason is or can be given for a tactic, the label 'tactic' will not prevent it from being used as evidence of ineffective assistance of counsel." *Miller,* 255 F.3d at 458.

were simply incorrect and were unreasonable conclusions based upon the record.

The appellate court also found, regarding the testimony about the kitchen sink knife, that "the presence of a second possible murder weapon in the house did not help [Petitioner] because the jury could infer that both assailants were wielding knives simultaneously. The presence of a knife in the victims' kitchen did not contradict Rienbolt's testimony that the knife she supplied was the murder weapon." *Steidl,* No. 4–99–0351, slip op. at 6, 783 N.E.2d 245. This court agrees with Petitioner that the record in this case does not support this finding. This court agrees that this analysis totally ignores what happened at Petitioner's trial and what the prosecution argued about the Rienbolt knife. After reviewing the record in this case, this court concludes that it is clear that the prosecution, in this closely balanced case, relied heavily on Rienbolt's claim that she had provided the police with the murder weapon in arguing that the jury should accept her testimony. The prosecution repeatedly argued that Rienbolt should be believed because she provided police with "the" murder weapon. To argue that two knives were used would have required the prosecutor to attack its own witness, Rienbolt, who always described the Rienbolt knife as the only one used during the murders and would have stripped the prosecution of it key argument that the forensic evidence strongly supported Rienbolt's testimony.

After careful review of the evidence and the reasons supporting the appellate court's decision, this court concludes that the decision was not even minimally consistent with the facts and circumstances of this case and was, therefore, unreasonable. The appellate court's determination that Petitioner failed to establish prejudice under *Strickland* was so inadequately sup-

ported by the record as to be unreasonable. Therefore, this court must conclude that the appellate court's decision was an unreasonable application of *Strickland* to the facts of this case. *See* 28 U.S.C. § 2254(d)(1). In addition, this court concludes that the appellate court's ruling on this issue resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d)(2).

## III. BROKEN LAMP TESTIMONY

■ At trial, Rienbolt testified that there was a broken lamp in the bedroom where the Rhoads were murdered and that "[s]omebody was holding a piece of it." Dosch testified that he moved a broken lamp from the bedroom to the hallway. The prosecution argued that "Rienbolt says that broken lamp was in the bedroom" and this was "a fact that was known to virtually no one because in fact the lamp was found outside the bedroom." The prosecutor argued that Rienbolt was "materially correct on everything, and not wrong on anything." Petitioner argues that it turns out that the evidence, as testified by two certified fire examiners, actually was that the lamp was not broken until after the fire, which was after the murders had already occurred. Petitioner contends that presentation of this evidence at trial would have eliminated the prosecutor's ability to use Rienbolt's reference to the broken lamp as corroboration of her account of the murders. Because Muller presented no evidence to refute Rienbolt's testimony, the jury was left only with the prosecutor's claim that the broken lamp was compelling proof that Rienbolt was telling the truth.

The appellate court, in rejecting this argument, stated:

No evidence shows that the lamp was broken when Rienbolt saw it to the extent that it was broken after the fire. [Petitioner] has failed to establish both that defense trial counsel's performance was deficient and that he was prejudiced by the failure of Muller to seek forensic investigation of whether the ceramic portion of the lamp was in fact broken prior to the fire being started. In any event, such a minor discrepancy in Rienbolt's testimony would not significantly discredit her description of seeing [Petitioner] and Whitlock stabbing the victims.

*Steidl,* No. 4–99–0351, slip op. at 8, 783 N.E.2d 245. This court concludes that calling this a "minor discrepancy" is inaccurate and not supported by the record in this case. As presented at trial, the lamp was a significant detail used to bolster Rienbolt's credibility. The prosecution relied heavily on Rienbolt's supposedly accurate description of the crime scene to offset her doubtful credibility and the inherently unbelievable nature of her story. Because of the importance attributed to the broken lamp by the prosecution, it was unreasonable for the appellate court to retroactively find this testimony insignificant.

Moreover, the appellate court indicated that the lamp may have been broken "some" prior to the fire and was later broken to the extent it was when it was found by Dosch. There is simply no record support for this supposition. Brown testified that the lamp was intact prior to the fire. This testimony was unequivocal and unrefuted. In addition, Tankersley stated that the portion of the lamp which was broken was broken after the time of the fire. The testimony of Brown and Tankersley is irreconcilable with Rienbolt's testimony that she saw a broken lamp and someone was holding a piece of it.

This court agrees with Petitioner that Muller's failure to investigate the lamp resulted in a missed golden opportunity to discredit Rienbolt. It would not have been difficult for Muller to find expert testimony that the lamp was intact prior to the fire. In fact, Tankersley was called as a witness at the trial. Had defense counsel presented expert testimony showing that Rienbolt's account of seeing a broken piece of the lamp was flatly inconsistent with the physical evidence from the crime scene, it would have gone a long way toward convincing the jury that Rienbolt's trial testimony was not actually an eyewitness account of the murders. This court concludes that there is a reasonable probability that scientific refutation of one of the key aspects of Rienbolt's testimony would have resulted in a different outcome at trial. This probability is sufficient to undermine confidence in the outcome. The appellate court's finding to the contrary constituted an unreasonable determination of the facts and an unreasonable application of the *Strickland* standard.

## IV. CUMULATIVE EFFECT

 Petitioner also argues that, even if no single piece of the excluded evidence was accepted in its entirely by the jury, the presentation of all of this additional information would have severely undermined the prosecution's attempt to bolster Rienbolt's credibility. Petitioner argues that, considering the cumulative effect of all of this evidence, there is a reasonable probability that the outcome of the trial would have been different. Respondent does not dispute that this court may consider the cumulative effect of defense counsel's deficiencies in determining whether to grant the writ of habeas corpus. *See Washington,* 219 F.3d at 634–35 (court must assess "the totality of the omitted evidence" under *Strickland*).

The appellate court rejected Petitioner's argument regarding the cumulative impact of Muller's deficiencies. In doing so, the court noted that Rienbolt was not the only witness against Petitioner at trial and specifically referred to the testimony of Herrington. *Steidl,* No. 4–99–0351, slip op. at 14, 783 N.E.2d 245. The court stated:

Any arguable deficiencies in defense trial counsel's performance were not cumulatively so prejudicial to [Petitioner] to indicate that the outcome of the trial would have been different had the alleged deficiencies of counsel not occurred. Nor do they cumulatively demonstrate the existence of a pervasive pattern of unfair prejudice to [Petitioner's] case.

*Steidl,* No. 4–99–0351, slip op. at 14, 783 N.E.2d 245. This court notes that the appellate court again applied the "would have been different" standard which is not the standard to apply under *Strickland. See Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495; *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This court further concludes that the appellate court's decision was clearly an unreasonable application of *Strickland.*

It is certainly true that Rienbolt was not the only witness against Petitioner at trial. However, Rienbolt was the prosecution's key witness as she claimed to be an eyewitness to the murders. A careful review of the record shows that a guilty verdict would have been unlikely based upon Herrington's testimony. Herrington was admittedly drunk during the events he testified to, was contradicted by two witnesses who testified that they saw Petitioner leave the Legion Hall alone that night, and was also contradicted by Petitioner's corroborated alibi which covered the time in question. This court further notes that Wells was a "jailhouse snitch," whose testimony had to be viewed with caution, and

did not testify that Petitioner at any time stated that he had committed the murders. This court concludes, based upon the record, that Rienbolt's testimony was the most damaging to Petitioner and discrediting her testimony was critical for Petitioner's defense counsel at trial.

This court has already concluded that the appellate court's ruling that Muller's representation was not ineffective under *Strickland* was unreasonable as far as his failure to present Brklach's testimony, his failure to present expert testimony that the Rienbolt knife was not the murder weapon, and his failure to investigate and present forensic evidence to contradict Rienbolt's testimony that a lamp in the Rhoads' bedroom was broken at the time of the murders. This court further concludes that, even if the individual instances of deficient performance were not, considered alone, sufficient to warrant the issuance of habeas corpus relief, considered together they clearly warrant relief. Considering all of this evidence that could have been presented but for Muller's errors, the proper application of *Strickland* should have left the appellate court with the belief that acquittal was reasonably probable if the jury had heard all of the evidence. *See Washington,* 219 F.3d at 635. The appellate court's decision to the contrary involved an unreasonable application of *Strickland's* prejudice component to the facts of this case. *See Washington,* 219 F.3d at 635.

## V. CONCLUSION

For all of the reasons stated, this court finds that Petitioner is entitled to relief under 28 U.S.C. § 2254.

IT IS THEREFORE ORDERED THAT:

(1) Petitioner's petition under 28 U.S.C § 2254 for a writ of habeas corpus (# 3) is GRANTED.

(2) Petitioner's conviction is hereby vacated. The State shall have 120 days from the date of the issuance of this Order to release or retry Petitioner. On the court's own motion, execution of this Order is stayed pending appeal.

(3) This case is terminated.